GAY AND LESBIAN LAW STUDENTS ASSOCIATION AT THE UNIVERSITY OF CONNECTICUT SCHOOL OF LAW *v.* BOARD OF TRUSTEES, UNIVERSITY OF CONNECTICUT, ET AL.
(15191)

Callahan, Berdon, Norcott, Katz and Palmer, Js.

---

454

Argued October 24, 1995—decision released March 26, 1996

*Paul M. Shapiro*, assistant attorney general, with whom were *Bernard F. McGovern, Jr.*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Jane L. Scarpellino*, assistant attorney general, for the appellants (defendants).

*Philip D. Tegeler*, with whom were *Marc E. Elovitz*, pro hac vice, and, on the brief, *Martha Stone, Ruth E. Harlow*, pro hac vice, and *Matthew A. Coles*, pro hac vice, for the appellee (plaintiff).

KATZ, J. The dispositive issue on appeal is whether, pursuant to General Statutes § 10a-149a, the United States military is prohibited from using the facilities and career services office of the University of Connecticut School of Law (law school) for recruitment purposes because of its current discrimination against gay men and lesbians. We conclude that it is.

The following facts are undisputed. The plaintiff, the Gay and Lesbian Law Students Association at the University of Connecticut School of Law, an unincorporated student organization that has as its primary objective the promotion of the needs of gay and lesbian students at the law school, brought an action against the defendants, the board of trustees of the University of Connecticut, the president of the university, Harry J. Hartley, and the dean of the law school, Hugh C. MacGill. The plaintiff alleged that by allowing the Judge Advocate General Corps of the United States Army, Navy, Air Force and Marines to recruit at the law school,

the defendants had violated General Statutes §§ 46a-81a through 46a-81r (Gay Rights Law)[1] and General

[1] The following sections from No. 91-58 of the 1991 Public Acts, entitled "An Act Concerning Discrimination on the Basis of Sexual Orientation," codified at General Statutes §§ 46a-81a through 46a-81r, are relevant to this appeal.

General Statutes § 46a-81a provides: "Sexual orientation discrimination: Definitions. For the purposes of sections 4a-60a, 45a-726a and 46a-81b to 46a-81r, inclusive, 'sexual orientation' means having a preference for heterosexuality, homosexuality or bisexuality, having a history of such preference or being identified with such preference, but excludes any behavior which constitutes a violation of part VI of chapter 952."

General Statutes § 46a-81c provides: "Sexual orientation discrimination: Employment. It shall be a discriminatory practice in violation of this section: (1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's sexual orientation, (2) for any employment agency, except in the case of a bona fide occupational qualification or need, to fail or refuse to classify properly or refer for employment or otherwise to discriminate against any individual because of the individual's sexual orientation, (3) for a labor organization, because of the sexual orientation of any individual to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members or against any employer or any individual employed by an employer, unless such action is based on a bona fide occupational qualification; or (4) for any person, employer, employment agency or labor organization, except in the case of a bona fide occupational qualification or need, to advertise employment opportunities in such a manner as to restrict such employment so as to discriminate against individuals because of their sexual orientation."

General Statutes § 46a-81g provides: "Sexual orientation discrimination: State practices. It shall be a discriminatory practice to violate any of the provisions of sections 46a-81h to 46a-81n, inclusive."

General Statutes § 46a-81i provides: "Sexual orientation discrimination: Services of state agencies. (a) All services of every state agency shall be performed without discrimination based upon sexual orientation.

"(b) No state facility may be used in the furtherance of any discrimination, nor may any state agency become a party to any agreement, arrangement or plan which has the effect of sanctioning discrimination.

"(c) Each state agency shall analyze all of its operations to ascertain possible instances of noncompliance with the policy of sections 46a-81h to 46a-81n, inclusive, and shall initiate comprehensive programs to remedy any defect found to exist.

"(d) Every state contract or subcontract for construction on public build-

Statutes § 10a-149a,[2] and had breached their contract
with the law school's students, based upon the law

ings or for other public work or for goods and services shall conform to
the intent of section 4a-60a."

General Statutes § 46a-81j provides: "Sexual orientation discrimination:
Job recruitment and placement services provided by state agencies. (a) All
state agencies, including educational institutions, which provide employ-
ment referrals or placement services to public or private employers, shall
accept job orders on a nondiscriminatory basis.

"(b) Any job request indicating an intention to exclude any person because
of sexual orientation shall be rejected.

"(c) All state agencies shall cooperate in programs developed by the
Commission on Human Rights and Opportunities initiated for the purpose
of broadening the base for job recruitment and shall further cooperate with
all employers and unions providing such programs.

"(d) The labor department shall encourage and enforce employers and
labor unions to comply with the policy of sections 46a-81h to 46a-81n,
inclusive, and promote equal employment opportunities."

General Statutes § 46a-81n provides: "Sexual orientation discrimination:
Allocation of state benefits. (a) Sexual orientation shall not be considered
as a limiting factor in state-administered programs involving the distribution
of funds to qualify applicants for benefits authorized by law.

"(b) No state agency may provide grants, loans or other financial assis-
tance to public agencies, private institutions or organizations which discrimi-
nate, unless exempted as provided in section 46a-81p."

General Statutes § 46a-81q provides: "Sexual orientation discrimination:
ROTC programs. The provisions of sections 4a-60a and 46a-81a to 46a-81o,
inclusive, shall not apply to the conduct and administration of a ROTC
program established and maintained pursuant to 10 USC Sections 2101 to
2111, inclusive, as amended from time to time, and the regulations thereun-
der, at an institution of higher education. For purposes of this section,
'ROTC' means the Reserve Officers' Training Corps."

General Statutes § 46a-81r provides: "Sexual orientation discrimination:
Construction of statutes. Nothing in sections 4a-60a, 45a-726a, 46a-51, 46a-
54, 46a-56, 46a-63, 46a-64b, 46a-65, 46a-67, 46a-68b, and 46a-81a to 46a-81q,
inclusive, subsection (d) of section 46a-82, subsection (a) of section 46a-
83, and sections 46a-86, 46a-89, 46a-90a, 46a-98, 46a-98a and 46a-99 shall
be deemed or construed (1) to mean the state of Connecticut condones
homosexuality or bisexuality or any equivalent lifestyle, (2) to authorize the
promotion of homosexuality or bisexuality in educational institutions or
require the teaching in educational institutions of homosexuality or bisexu-
ality as an acceptable lifestyle, (3) to authorize or permit the use of numerical
goals or quotas, or other types of affirmative action programs, with respect
to homosexuality or bisexuality in the administration or enforcement of the
provisions of sections 4a-60a, 45a-726a, 46a-51, 46a-54, 46a-56, 46a-63, 46a-

school's internal nondiscrimination policy.[3] The plaintiff sought an injunction barring the use of law school facilities and the career services office by any organization, including the military, that discriminates on the basis of sexual orientation and a declaratory judgment declaring that the defendants had violated both the Gay Rights Law and § 10a-149a.

Shortly thereafter, the plaintiff filed an application for a temporary injunction to prevent an anticipated recruiting visit by the Judge Advocate General Corps to the law school campus. The defendants filed a motion to dismiss claiming, inter alia, that the plaintiff was not aggrieved and that it lacked standing to pursue the action. The trial court denied that motion. The parties then filed a stipulation of facts.[4] Following an evidentiary hearing on the temporary injunction, at which the

64b, 46a-65, 46a-67, 46a-68b, and 46a-81a to 46a-81q, inclusive, subsection (d) of section 46a-82, subsection (a) of section 46a-83, and sections 46a-86, 46a-89, 46a-90a, 46a-98, 46a-98a and 46a-99, (4) to authorize the recognition of or the right of marriage between persons of the same sex, or (5) to establish sexual orientation as a specific and separate cultural classification in society."

[2] General Statutes § 10a-149a provides: "Military recruiters; access to directory information and on-campus recruiting. Notwithstanding any other provision of law to the contrary, each constituent unit of the state system of higher education and any private college or university which receives state funds shall, subject to the provisions of subdivision (11) of subsection (b) of section 1-19, provide the same directory information and on-campus recruiting opportunities to representatives of the armed forces of the United States of America and state armed services as are offered to nonmilitary recruiters or commercial concerns."

[3] Because the breach of contract claim was not decided by the trial court, it is not an issue on appeal.

[4] The stipulation of facts provides in relevant part:

"5. It is the written policy of the University of Connecticut and the Law School 'to prohibit discrimination in education, employment, and in the provision of services on the basis of race, religion, sex, age, marital status, national origin, ancestry, sexual preference, status as a disabled veteran or veteran of the Vietnam Era, physical or mental disability, or record of such impairments, or mental retardation' (hereinafter referred to as the Law School's non-discrimination policy). This policy has been applied by the Law School to its Office of Career Services.

stipulation was introduced into evidence, the trial court concluded that, although all employers who used the school's career services office were required to abide by the law school's nondiscrimination policy, which forbids, inter alia, discrimination in employment on the

"6. The Law School's non-discrimination policy is widely distributed to law students, applicants to the Law School, potential legal employers and others, through student handbooks, course catalogs, Office of Career Services publications, and other documents.

"7. The Law School provides on-campus recruiting, interviewing, and other placement services to potential employers through its Office of Career Services. Such services include but are not limited to providing directory information to potential employers, scheduling, arranging and providing space for on-campus interviews by prospective employers, providing job listings for potential employers, career counselling, assisting students with resumes and interviewing, and screening of potential employers to ensure compliance with the Law School's non-discrimination policy.

"8. All employers who use the services of the Office of Career Services, except military recruiters, are required to abide by the Law School's non-discrimination policy.

"9. Each potential employer, except military recruiters, is required to certify in writing, prior to engaging in on-campus interviews, that it conforms to the Law School's non-discrimination policy barring discrimination on the basis of sexual preference.

"10. At the present time, all branches of the United States military service, including the Judge Advocate General Corps of the Army, Navy, and Air Force, continue to discriminate against gay men and lesbians in hiring and employment.

"11. Defendants permit the Judge Advocate General Corps of the United States Army, Navy, and Air Force to omit or amend the required certification to indicate that they are not in compliance with the Law School's policy on sexual preference discrimination.

"12. The defendants permit branches of the United States military to recruit and interview at the Law School [notwithstanding] of their policy of discrimination against gay men and lesbians, and have continued to permit the Judge Advocate General Corps of the Army, Navy and Air Force to recruit on campus after the effective date of [No. 91-58 of the 1991 Public Acts].

"13. During the 1991–92 academic year, representatives of the Judge Advocate General Corps of the Army, Navy and Air Force utilized the services and facilities of the Office of Career Services and conducted on-campus interviews at the Law School on at least three separate occasions.

"14. Assistance in securing employment is an important service provided by the Law School.

"15. The Judge Advocate General Corps of the Army, Navy, and Air Force are the only employers that defendants allow to fail to comply with the Law

basis of sexual preference, the defendants, nevertheless, knowingly permitted and even assisted branches of the United States military to recruit and interview at the law school despite the military's open policy of discrimination against gay men and lesbians. Because § 10a-149a only requires the defendants to provide the same opportunities to the military that it affords other employers, the trial court concluded that the defendants' conduct violated the Gay Rights Law. Accordingly, the trial court issued a temporary injunction barring the defendants from permitting any organization, including the military, that discriminates on the basis of sexual orientation from using on-campus employment recruiting facilities or other employment services of the law school and its office of career services.

Following the issuance of a temporary injunction, the parties agreed that the hearing and record from the temporary injunction could be consolidated with the final hearing and record on a permanent injunction. As such, the only remaining issue for the court to consider prior to issuing a permanent injunction was whether the United States military continued to discriminate against gay men and lesbians. On the basis of its finding that, pursuant to the revised United States Department of Defense policy on gays in the military, the military

School's non-discrimination policy and still use the on-campus recruiting and other placement services of the Law School.

"16. On at least three separate occasions, plaintiff Association requested, through defendant MacGill, that the Law School refuse to permit military recruiters to interview on campus, because of their policy of discrimination on the basis of sexual orientation.

"17. Notwithstanding these requests, defendants MacGill, Hartley and Board of Trustees have permitted continuing access to the Law School's Office of Career Services by branches of the United States military that discriminate on the basis of sexual orientation.

"18. Defendants intend to continue to permit branches of the United States military to interview on campus and utilize the services of facilities of the Law School's Office of Career Services during the upcoming 1992–93 academic year."

continued to discriminate against gay men and lesbians, the trial court issued a permanent injunction identical to the earlier temporary injunction.

The defendants appealed this ruling to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). They claim on appeal that: (1) the trial court lacked jurisdiction over this case in the absence of notice under Practice Book § 390 (d);[5] (2) the plaintiff did not have standing to bring this action; (3) the plaintiff was not aggrieved by the defendants' actions; and (4) § 10a-149a overrides the law school's obligations under the Gay Rights Law. The defendants do not challenge the trial court's finding that the military continues to discriminate on the basis of sexual orientation. We affirm the judgment of the trial court.

I

The defendants argue that because the plaintiff failed to comply with § 390 (d),[6] in that it failed to notify the military of the pending action, the trial court was without jurisdiction to enter an injunction. The defendants recognize that, on its face, § 390 (d) applies only to a claim for a declaratory judgment and that the trial court did not grant a declaratory judgment. They argue, nevertheless, in reliance on *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 35, 653 A.2d 168 (1995), that because the plaintiff's claims for injunctive and declaratory relief

---

[5] Following the briefing in this appeal, this court, sua sponte, ordered simultaneous briefs addressing the following question: "Did the trial court lack jurisdiction over this case seeking a declaratory judgment in the absence of notice under Practice Book § 390 (d) to organizations that discriminate on the basis of sexual orientation, including the branches of the United States military that recruit at the University of Connecticut School of Law?"

[6] Practice Book § 390 provides in relevant part: "The court will not render declaratory judgments upon the complaint of any person . . .

"(d) unless all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof."

depended upon the trial court's interpretation of § 10a-149a, the claims were "inexorably intertwined." Accordingly, the plaintiff should have notified the military of this action, and its failure to do so deprived the trial court of jurisdiction.

The plaintiff responds that § 390 (d) is inapplicable because it never pursued its claim for declaratory relief, and the trial court never considered or ruled on that claim. Rather, the trial court issued an injunction pursuant to General Statutes § 46a-99,[7] which statutorily authorizes a trial court to issue an injunction where General Statutes § 46a-81i or General Statutes § 46a-81j has been violated. Finally, the plaintiff contends that the affected branches of the military had actual notice of this case since 1992.

We agree with the plaintiff that § 46a-99 is the controlling provision in this case. Furthermore, we conclude that § 46a-99 does not contain a notice requirement and that the procedural requirement of § 390 (d) should not be grafted onto this section. In enacting § 46a-99, the legislature has provided a mechanism to ensure that discrimination is eradicated. Had it intended there to be any particular additional procedural conditions, such as a notice requirement, the legislature could have included them. See, e.g., General Statutes §§ 52-45a through 52-72.

Moreover, the defendants' reliance on *Mannweiler* v. *LaFlamme*, supra, 232 Conn. 27, is misplaced. In that case, in concluding that § 390 (d) applied, this court explicitly recognized that the trial court had, in fact, considered and decided the declaratory relief claim.

---

[7] General Statutes § 46a-99 provides: "Discriminatory state practice: Cause of action; relief. Any person claiming to be aggrieved by a violation of any provision of sections 46a-70 to 46a-78, inclusive, or sections 46a-81h to 46a-81o, inclusive, may petition the superior court for appropriate relief and said court shall have the power to grant such relief, by injunction or otherwise, as it deems just and suitable."

"Neither the trial court's memorandum of decision nor the judgment file indicates that the declaratory judgment aspect of this case was not determined by the trial court." Id., 31. In the present case, the trial court never mentioned declaratory relief in any of its decisions, and, in its final judgment, the court specifically ordered a permanent injunction as its sole remedy. Consequently, *Mannweiler* does not dictate that the notice requirements of § 390 (d) control in this case. We conclude, therefore, that the plaintiff's failure to comply with § 390 (d) did not adversely impact the trial court's jurisdiction to issue a permanent injunction.

## II

In their second procedural claim, the defendants argue that the trial court's determination that the plaintiff had associational standing to bring this action was improper. We are not persuaded.

"The fundamental aspect of standing . . . [is that] it focuses on the party seeking to get his complaint before [the] court and not on the issues he wishes to have adjudicated. *Flast* v. *Cohen*, 392 U.S. 83, 99, 88 S. Ct. 1942, 20 L. Ed. 2d 947 [1968]. *Hartford Kosher Caterers, Inc.* v. *Gazda*, 165 Conn. 478, 485, 338 A.2d 497 (1973). Standing is not a technical rule intended to keep aggrieved parties out of court . . . . Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. See, e.g., *Baker* v. *Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *Stern* v. *Stern*, 165 Conn. 190, 192, 332 A.2d 78 (1973). *Maloney* v. *Pac*, 183 Conn. 313, 320–21, 439 A.2d 349 (1981). The requirements of justiciability and controversy are ordinarily held to have been met when a complainant makes a colorable claim

of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. [*Maloney* v. *Pac*, supra, 321]. As long as there is some direct injury for which the plaintiff seeks redress, the injury that is alleged need not be great. Id.; see *Bassett* v. *Desmond*, 140 Conn. 426, 432, 101 A.2d 294 (1953). Where the nexus between the injury and the claim sought to be adjudicated is obvious and direct, a plaintiff has standing to maintain the claim. *Maloney* v. *Pac*, supra, 322." (Internal quotation marks omitted.) *Connecticut Assn. of Health Care Facilities, Inc.* v. *Worrell*, 199 Conn. 609, 612–13, 508 A.2d 743 (1986).

When deciding whether an association has standing to bring a claim, we have adopted the federal standard of associational standing as set forth in *Hunt* v. *Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Id.; see *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976); *California Bankers Assn.* v. *Shultz*, 416 U.S. 21, 94 S. Ct. 1494, 39 L. Ed. 2d 812 (1974); *Sierra Club* v. *Morton*, 405 U.S. 727, 739, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972). Representational standing depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. *Warth* v. *Seldin*, 422 U.S. 490, 515, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)." (Internal quotation marks omitted.) *Con-*

*necticut Assn. of Health Care Facilities, Inc.* v. *Worrell,* supra, 199 Conn. 616; accord *Windham Taxpayers Assn.* v. *Board of Selectmen,* 234 Conn. 513, 527, 662 A.2d 1281 (1995).

The plaintiff argues that it has sustained its burden of proof and has satisfied this test.[8] The defendants challenge only the first prong of the test. They rely on *Lujan* v. *Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), wherein the United States Supreme Court set forth a three part test to determine individual standing. First, a plaintiff must demonstrate an "injury in fact," that is, an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent" rather than "conjectural or hypothetical." Id. Second, there must be a causal connection between the defendants' conduct and the alleged injury. The injury must be "fairly . . . trace[able] to the challenged action of the defendant[s], and not . . . th[e] result [of] the independent action of some third party not before the court." (Internal quotation marks omitted.) Id. Third, the alleged injury will "likely," rather than "speculatively," be "redressed by a favorable decision." Id., 561.

The defendants argue that the plaintiff has not satisfied this test because of its failure to allege that any of its members had been denied an interview with the Judge Advocate General Corps or that any member had been denied a service of the law school's office of career services. The plaintiff responds that, assuming *Lujan* governs this court's standing analysis,[9] it meets the

---

[8] It is undisputed that the plaintiff has the burden of proof on the issue of standing and that unless the claimant has standing, the trial court does not have subject matter jurisdiction. *Orsi* v. *Senatore,* 230 Conn. 459, 470, 645 A.2d 986 (1994); *Sadloski* v. *Manchester,* 228 Conn. 79, 83–85, 634 A.2d 888 (1993).

[9] The plaintiff argues that because *Lujan* is a plurality opinion and has not yet been relied upon by Connecticut courts, it does not govern.

standing requirements recited in that case. We conclude that the trial court properly determined that the plaintiff had standing.

This court has had many opportunities to determine what constitutes standing. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . *Unisys Corp.* v. *Dept. of Labor*, 220 Conn. 689, 693, 600 A.2d 1019 (1991)." (Internal quotation marks omitted.) *Presidential Capital Corp.* v. *Reale*, 231 Conn. 500, 504, 652 A.2d 489 (1994). "Standing requires no more than a colorable claim of injury; a plaintiff ordinarily establishes his standing by *allegations* of injury. Similarly, standing exists to attempt to vindicate 'arguably' protected interests. *Ducharme* v. *Putnam*, 161 Conn. 135, 139, 285 A.2d 318 (1971); see also *Assn. of Data Processing Service Organizations* v. *Camp*, 397 U.S. 150, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970)." (Emphasis in original.) *Maloney* v. *Pac*, supra, 183 Conn. 321 n.6.[10]

The infringement of the rights of the plaintiff's members under the Gay Rights Law was concrete and particularized as well as actual and imminent. The members had been denied equal placement opportunities because the career services office had allocated resources to the military, which would not, regardless of their abilities and talents, hire them. The director of the office of career services, Diane Panciera, admitted that the office allocates resources to military employers and spends time accommodating the military, including

---

[10] There is little material difference between what we have required and what the United States Supreme Court in *Lujan* demanded of the plaintiff to establish standing.

arranging for and following up on on-campus interviews. That conduct has created a lack of equal access to the office of career services and has caused some of the plaintiff's members to reevaluate their approaches to the career services department. Moreover, by allowing the military to use the services of the placement office and to conduct on-campus interviews, the defendants sanctioned impermissible discrimination that caused the plaintiff's members to have feelings of shock, anger, humiliation, frustration and helplessness.[11] Finally, the violation of the members' rights under the Gay Rights Law was continuing and, at the time of the temporary injunction hearing, was about to increase upon the arrival of military recruiters to conduct interviews. By permanently enjoining on-campus recruiting by the military, the trial court secured the members' rights under the Gay Rights Law.

This case is a far cry from the attenuated claim in *Lujan* v. *Defenders of Wildlife*, supra, 504 U.S. 555, upon which the defendants exclusively rely. Therein, the subject association claimed standing because two of its members who planned to travel abroad in the future would have their ability to view certain wildlife jeopardized as a result of a restrictive interpretation of the Endangered Species Act of 1973 limiting its applicability to the United States and the high seas. Id., 559, 562–63. In contrast, the plaintiff's members in this case are not merely members of the general public who have failed to demonstrate how they have been harmed in

---

[11] The factual findings and legal conclusions by the trial court are unequivocal: "The law school's assistance in securing employment is one of the most important services that the law school provides. However, it has given an employer (specifically, the military) the license to discriminate through the use of the school's services and facilities. As a result of the school's policy and practices, gay and lesbian members of [the] plaintiff association have been offered fewer placement opportunities than heterosexual students. They have suffered stigma, humiliation, and the loss of professional and educational benefits as a result of [the] defendants' unlawful conduct."

some unique way. Cf. *Monroe* v. *Horwitch*, 215 Conn. 469, 473, 576 A.2d 1280 (1990) (because plaintiff is "simply a member of the general public who has not demonstrated how she was harmed in a unique fashion," she is not aggrieved). Accordingly, because the plaintiff's members would have otherwise had standing to sue in their own right, we conclude that the trial court's determination that the plaintiff had standing to bring this action was proper.

## III

In the third issue on appeal, the defendants argue that because the plaintiff was not aggrieved by the law school's decision to allow the military to use the placement and career services facilities to recruit on campus, the trial court lacked subject matter jurisdiction.[12] Because aggrievement is a predicate to the court's subject matter jurisdiction, it must be resolved in the plaintiff's favor in order for this court to proceed to the merits.

"The [fundamental] test for determining aggrievement encompasses a well settled twofold determination: first, the party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community as a whole; second, the party claiming aggrievement must establish that this specific personal and legal interest has been specially and injuriously affected by the decision. *Zoning Board of Appeals* v. *Freedom of Information Commission*, 198 Conn. 498, 502, 503 A.2d 1161 (1986) [superseded on other grounds by *Hartford* v. *Freedom of Information Commission*, 201 Conn. 421, 518 A.2d 49 (1986)]; *Cannavo Enterprises, Inc.* v. *Burns*, 194 Conn. 43, 47, 478 A.2d 601 (1984); *Local 1303 & Local*

---

[12] Pursuant to § 46a-99; see footnote 7; a party must be aggrieved in order to petition the Superior Court for relief.

*1378* v. [*Freedom of Information Commission,* 191 Conn. 173, 176, 463 A.2d 613 (1983)]; *Mystic Marinelife Aquarium, Inc.* v. *Gill,* 175 Conn. 483, 493, 400 A.2d 726 (1978)." (Internal quotation marks omitted.) *Windham Taxpayers Assn.* v. *Board of Selectmen,* supra, 234 Conn. 523.

The defendants claim that although the plaintiff may indeed have intense feelings regarding the military recruiting on campus despite its discriminatory practices, " '[a] mere grievance to one's sense of propriety or sense of justice' " does not equate with legal aggrievement. They claim that the plaintiff must have members who actually desire a military career and were denied an interview with a branch of the military service in order to be aggrieved. Additionally, they assert that the plaintiff's alleged injury is the result of the policies of the Department of Defense and not the defendants' conduct. We disagree.

The defendants' arguments ignore the facts that the trial court reasonably found. Specifically, the trial court found that the "assistance in securing employment is one of the most important services that the law school provides" and that by allowing an organization that discriminates against gay and lesbian students to use its facilities and services, the law school contributed to such students having "fewer placement opportunities than heterosexual students." This lack of equal access to professional and educational benefits as a result of the defendants' conduct, as well as the stigma and humiliation created by the inequities, constituted injuries sufficient to satisfy the aggrievement threshold.

The defendants' argument that, because the plaintiff has not demonstrated that one of its members was denied an interview with the military, there can be no aggrievement is misplaced. The relevant question is not whether one of the plaintiff's members wants to join the military; rather, the relevant question is whether

the members are receiving the same placement opportunities as heterosexual students. Furthermore, the defendants' suggestion that the plaintiff's complaint is really against the military and not the school mischaracterizes the problem. An action pursuant to § 46a-99 is directed at discrimination by state agencies, such as the University of Connecticut, and not federal departments.[13]

Having disposed of the defendants' arguments, we conclude that the plaintiff has been aggrieved by the defendants' conduct. The legislature has provided an unequivocal prohibition on any state agency from becoming "a party to any agreement, arrangement or plan which has the effect of sanctioning discrimination." General Statutes § 46a-81i (b). In unambiguous language contained in that same subsection, the legislature has also made it clear that "[n]o state facility may be used in the furtherance of any discrimination." By providing its facilities for on-campus interviews by a discriminatory employer, and by participating in the arrangement and scheduling of these interviews on behalf of such an employer, the law school, and not the military, has knowingly violated the specific provisions of the Gay Rights Law. The plaintiff is not asserting some generalized grievance shared by every citizen. The Gay Rights Law protects the plaintiff's members, citizens who are gay men or lesbians and who have been the subject of discrimination as a result of their sexual preferences. As members of the very class protected by the Gay Rights Law, who seek protection by the act from the very harms they allege to have experienced, the plaintiff's members have the greatest

---

[13] Indeed, the trial court recognized this distinction when it stated that "[a]lthough federal law allows the military to discriminate based on sexual preference, the court finds no federal law which requires state institutions (such as [the law school]) to allow the military on campus for recruiting purposes."

legal interest in the enforcement of the statutory prohibitions and are clearly distinguishable from the community at large. Furthermore, those members have been specially and injuriously affected by the decision of the law school to permit on-campus recruiting activities by the military because this decision has violated their rights to be protected from discrimination under the Gay Rights Law. We conclude, therefore, that the plaintiff has established that it was aggrieved.

## IV

The last issue that we address involves interpreting § 10a-149a in order to determine whether this provision requires that the law school afford military recruiters access to the school.[14] After considering the language of the statute and its legislative history and purpose, the trial court concluded that because § 10a-149a requires that the law school treat military and nonmilitary recruiters alike and because the law school must ban nonmilitary recruiters who discriminate on the basis of sexual orientation, the law school must similarly ban all military recruiters. We agree.

The plaintiff argues on appeal that the language of the statute clearly provides that the law school is to "provide the *same* directory information and on-campus recruiting opportunities to representatives of the armed forces of the United States of America and state armed services as are offered to nonmilitary recruiters or commercial concerns." (Emphasis added.) General Statutes § 10a-149a. The plaintiff interprets this language to mean that military and nonmilitary recruiters are to be afforded equal, identical recruiting opportunities. Therefore, because the law school cannot permit

---

[14] Our analysis of § 10a-149a applies not only to the law school, but also to the other entities reached by the statute, namely, all state colleges and universities and any private college or university that receives state funds. See footnote 2 for the text of § 10a-149a.

a civilian employer who discriminates on the basis of sexual orientation to recruit on campus, it cannot allow the military to recruit on campus. Furthermore, the plaintiff claims that the legislative history of this statute supports its position in that there was overwhelming sentiment among the senators and the representatives and those who testified at legislative committee hearings that § 10a-149a sought merely to provide equal access to military and nonmilitary recruiters and not preferential access to the military.

In contrast, the defendants, who similarly agree that the language is plain and unambiguous, focus on the first phrase of § 10a-149a that provides "[n]otwithstanding any other provision of law to the contrary" to conclude that the statute mandates that military recruiters be afforded the same recruiting opportunities as civilian recruiters, regardless of any contrary laws, such as anti-discrimination laws, and that any conflict between § 10a-149a and any other law "must be resolved in favor of requiring access by military recruiters." Therefore, according to the defendants, the law school must permit the military to recruit on campus, even though this would result in the school violating §§ 46a-81i and 46a-81j.[15] Furthermore, the defendants argue that because the language of the statute is clear, the trial court should not have considered the statute's legislative history, which, the defendants claim, is nonetheless inconclusive.

In order to determine whether the law school must deny the military access to on-campus recruiting opportunities, we must construe § 10a-149a. "It is fundamental that statutory construction requires us to ascertain

[15] We agree with the dissenting opinion by Justice Palmer that "the rule set forth in § 10a-149a *shall take precedence over any other provision of the law* that would otherwise bar the military from engaging in the same on-campus recruitment activities as civilian employers." (Emphasis in original.) Where we differ, however, is in our interpretation of the "rule."

the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation." (Citation omitted; internal quotation marks omitted.) *Murchison* v. *Civil Service Commission,* 234 Conn. 35, 45, 660 A.2d 850 (1995); accord *LoPresto* v. *State Employees Retirement Commission,* 234 Conn. 424, 447, 662 A.2d 738 (1995). Our examination of the language, legislative history and purpose of § 10a-149a leads us to conclude that the plaintiff provides the more sound interpretation of the statute.

Solely on the basis of the statute's plain language, we agree with the plaintiff that the statute clearly requires that the law school must provide military employers with the "same" recruitment opportunities as civilian employers. This necessarily means that military and civilian employers must be treated equally, with the same benefits and under the same limitations. Accordingly, because the law school can permit only a civilian employer that does not discriminate on the basis of sexual orientation to recruit on campus, it must permit the military similarly to recruit only if it does not discriminate on the basis of sexual orientation. The defendants' interpretation would result in the military and civilian employers not receiving the same treatment because the military would be permitted to discriminate and would reap the benefits of recruiting. Therefore, the ability to recruit by the military would create additional privileges.

Furthermore, we reject the defendants' construction of the "notwithstanding" clause. At the outset, we note that we have long held that provisos and exceptions to statutes are to be strictly construed with doubts resolved in favor of the general rule rather than the

exception and that "those who claim the benefit of an exception under a statute have the burden of proving that they come within the limited class for whose benefit it was established." *Conservation Commission* v. *Price*, 193 Conn. 414, 424, 479 A.2d 187 (1984); accord *Aaron* v. *Conservation Commission*, 183 Conn. 532, 549, 441 A.2d 30 (1981); see 2A J. Sutherland, Statutory Construction (5th Ed. Singer 1992) §§ 47.08 and 47.11. The defendants have failed to prove that this proviso means that the military should be permitted to recruit on campus in spite of the fact that it discriminates on the basis of sexual orientation and the fact that such recruitment would violate §§ 46a-81i and 46a-81j.

The defendants maintain that, at the time § 10a-149a was enacted in 1984, discrimination by state agencies on the basis of gender, disability and age was prohibited by General Statutes §§ 46a-71 and 46a-72. The military, however, openly discriminated on these bases, as it continues to do today. The defendants argue that because the military was then permitted to recruit on the law school's campus pursuant to § 10a-149a notwithstanding these other protecting statutes,[16] it should similarly be permitted to recruit now even though it violates the Gay Rights Law. We disagree. There is no indication in the language of the statute or in its legislative history that the "notwithstanding" clause refers to these statutes. See footnote 20. Rather, strictly construing the plain language of § 10a-149a, we discern that "any other provision[s] of law to the contrary" to which the statute refers are those that are contrary to the substance of this law, in specific, those statutes that would deny the military the same directory and recruiting opportunities as are provided to private employers.

---

[16] The issues of whether the military actually violates these antidiscrimination statutes and whether such violation would also preclude the military from recruiting under § 10a-149a have not been raised and, therefore, we need not resolve them.

Antidiscrimination statutes do not explicitly prohibit such access to the military. It is only by applying these statutes to the military in light of its practices and policies that these statutes are arguably "to the contrary."

Furthermore, the legislative history of the exemption in the Gay Rights Law for the Reserve Officers' Training Corps (ROTC); General Statutes § 46a-81q; confirms our conclusion that the legislature did not consider the "notwithstanding" proviso in § 10a-149a to refer to the antidiscrimination statutes in effect when § 10a-149a was passed, namely, §§ 46a-71 and 46a-72. When, in 1991, the legislature added the ROTC exemption by enacting No. 91-58 of the 1991 Public Acts explicitly excusing the ROTC from complying with the Gay Rights Law, it expressed concern that without the exemption, all ROTC programs in the state would be eliminated. In other words, it considered that because the military discriminated on the basis of sexual orientation, the ROTC would be in violation of the Gay Rights Law and that such violation would preclude the ROTC's presence on campus. See 34 H.R. Proc., Pt. 7, 1991 Sess., pp. 2666–67. This specific exemption was essential to save the program. Id. The legislature, however, had not previously expressed and did not then express any concerns that the military, in general, or the ROTC, in specific, had been in violation of the other antidiscrimination statutes.[17] Because the legislature did not per-

---

[17] We assume that the legislature might have considered that the discrimination by the military had not been illegal because the restrictions by the military were limited to bona fide occupational qualifications. The military discriminates on the basis of gender in that women are barred from combat duty; it discriminates on the basis of age in that no one over the age of thirty-five may enlist unless that person has prior service; and it discriminates on the basis of disability in that only able-bodied persons are permitted to enlist. We take no position on whether these discriminatory practices by the military qualify as bona fide occupational qualifications and recognize only, as a reflection of its intent, that the legislature might have considered them as such.

ceive that the military had been in violation of these statutes, military and nonmilitary employers were not being treated differently. Therefore, because these statutes were not considered by the legislature to be provisions of law by which the military receives different treatment from nonmilitary employers, these statutes could not have been the "provision[s] of law to the contrary" referred to in § 10a-149a. Accordingly, we reject the defendants' construction of the "notwithstanding" clause.

In further support of our conclusion that the legislature intended schools to bar *any* employer that violates the Gay Rights Law from recruiting on campus, we consider the tenet of statutory construction referred to as expressio unius est exclusio alterius, which may be translated as "the expression of one thing is the exclusion of another." Black's Law Dictionary (6th Ed. 1990); 73 Am. Jur. 2d, Statutes § 211 (1974). "[W]here express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute." 73 Am. Jur. 2d, supra, § 316; see *Iovieno* v. *Commissioner of Correction*, 222 Conn. 254, 258, 608 A.2d 1174 (1992); *Chairman* v. *Freedom of Information Commission*, 217 Conn. 193, 200, 585 A.2d 96 (1991). Thus, by exempting only the ROTC from the Gay Rights Law, the presumption is that the legislature did not intend to excuse the law school from complying with the Gay Rights Law by assisting the military in its recruitment activities. Had the legislature wanted to excuse state schools from complying with the Gay Rights Law, it could have included such a provision.

The legislative history and purpose of the statute confirms our conclusion that to allow the military to recruit would afford the military preferential treatment in violation of § 10a-149a. Number 83-576 of the 1983 Public Acts, codified at General Statutes § 10a-87, was

enacted in response to the University of Connecticut's board of trustees' decision to ban completely from the university all military recruiters. That public act provided an unconditional right of access to state schools for military recruiters.[18] Thus, under § 10a-87, the law school was required to provide access to military recruiters under all circumstances. Interestingly, however, the legislative history indicates that such unconditional access was not the goal of that statute. Senator Thomas Scott stated that the underlying goal was to "ban [state universities] from banning military recruiters and military recruiters ought to in turn be treated like anybody from a corporation or anybody else who wishes to come to a campus and talk to students about job opportunities . . . ." 26 S. Proc., Pt. 13, 1983 Sess., p. 4530. Section 10a-87 was repealed by No. 84-87 of the 1984 Public Acts, codified at § 10a-149a. In contrast to Public Act 83-576, the current statute explicitly limits the access of military recruiters by requiring that military recruiters be provided with only the same access as nonmilitary recruiters and, therefore, more accurately reflects the legislative intent embodied in the legislative history of the 1983 and 1984 acts. The previous unconditional access was abolished.

Furthermore, it is unequivocally clear from the Senate and House of Representatives floor debates and the legislative committee hearing testimony[19] that the

---

[18] Public Act 83-576 provides in relevant part: "The board of trustees shall be prohibited from denying access to any campus under its jurisdiction to any representative of the armed forces of the United States of America who seeks entrance onto any such campus for the purpose of conducting job interviews."

[19] "Although we generally restrict our review of a statute's legislative history to the discussions conducted on the floor of the House of Representatives or of the Senate, we will consider such committee hearing testimony of individuals addressing the proposed enactment when such testimony provides particular illumination for subsequent actions on proposed bills, such as in this instance." *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 695 n.10, 595 A.2d 313 (1991).

purpose of this statute is to provide equal access to military and civilian recruiters. Preferential access and treatment to the military is plainly rejected. Representative Dorothy C. Goodwin described the bill as "a nondiscrimination bill which says that recruiters for the armed services will be treated *on exactly the same basis with no exceptions* as any other job recruiter on any high school or college campus in the state . . . [and that the purpose of the bill is] to make sure that the armed forces of the United States are *not either handicapped or advantaged in any way* in the recruitment process." (Emphasis added.) 27 H.R. Proc., Pt. 3, 1984 Sess., p. 964. Senator Steven C. Casey stated that the bill would require that the military be afforded "the same . . . on-campus recruiting opportunities" that are provided to other recruiters. 27 S. Proc., Pt. 3, 1984 Sess., p. 1131. Furthermore, Joseph Constantine, the coordinator of guidance and health for the Hartford public school system at the time of the enactment of § 10a-149a, stated that the purpose of the bill "is simply to provide equity . . . equal access to the military . . . ." Conn. Joint Standing Committee Hearings, Education, Pt. 2, 1984 Sess., p. 369. Significantly, Major Louis Wein of the United States Marine Corps Reserve stated that this bill would ensure "that military recruiters are given equal access, *not preferential access*, but equal access to schools. The same access that a school would provide to another business or an educational institution. . . . [He further stressed] that *this is not a preferential bill. This is an equal access bill.*" (Emphasis added.) Id., pp. 404–405. Stanley Pac, then commissioner of environmental protection, speaking as a private citizen, indicated that "this bill would give the military recruiters the same rights that other recruiters have on campus . . . ." Id., p. 411. Lastly, Major George Messier, then commanding officer of the Marine Corps recruiting station in Hartford, responded in the affirmative to the

question that "this [bill] would be only to insure equity, fairness?" Id., p. 415. Because the defendants are asking us to grant the military preferential access, in that military recruiters would be allowed to use the law school's services and facilities in spite of the fact that the military discriminates on the basis of sexual orientation, while a civilian employer who discriminated on the basis of sexual orientation would be denied such access, we reject their argument.[20]

We are further persuaded by the New York Court of Appeals' recent interpretation of New York Education Law § 2-a (McKinney 1988), enacted in 1984, which is similar to § 10a-149a. *Lloyd* v. *Grella*, 83 N.Y.2d 537, 634 N.E.2d 171, 611 N.Y.S.2d 799 (1994). Section 2-a provides that "[n]otwithstanding any other provision of law to the contrary, if a . . . board of education . . . permits access to . . . school property to persons who inform pupils of educational, occupational or career opportunities, such . . . board . . . shall provide

---

[20] We note that in 1984, the "notwithstanding" clause was adopted from a New Hampshire statute that provides: "Duty to Provide Access. Notwithstanding any other provision of law to the contrary, all public high schools and all institutions within the state university system, and all private high schools, colleges and universities which receive state funds shall offer the same on-campus recruiting opportunities to representatives of state or United States armed services as they offer to nonmilitary recruiters." N.H. Rev. Stat. Ann. § 186.68 (1989). Its legislative history is similar to that of § 10a-149a in that it expresses the sentiment of ensuring equal and not preferential access for the military, does not refer to any antidiscrimination law in effect at the time, and is silent on the issue of what the "notwithstanding" clause refers to.

We further note that the current statute is more expansive in scope in that it applies not only to state universities, but also to private colleges receiving state funds. In addition, it seeks to ensure both the same on-campus recruiting opportunities and the same directory information for both military and nonmilitary employers. See footnote 2 for the text of § 10a-149a. Because § 10a-149a targets a broader audience than its predecessor, the "notwithstanding" clause may have been added in 1984 in order to protect against other statutes dealing with directory information and private colleges that may have been in existence at that time.

access to . . . such school property *on the same basis* for official representatives [of the military] . . . ." (Emphasis added.) In *Lloyd*, the plaintiff argued that § 2-a invalidated the city of Rochester school board's resolution adopted in 1991, which, in effect, denied on-campus access to the military because of its discriminatory practices.[21] Id., 542. The New York Court of Appeals disagreed because it concluded that § 2-a is clearly an "equal access" statute. Id., 545.

The court reasoned that § 2-a "was enacted to over-come the [wholesale] discriminatory exclusion of the military from schools for recruitment purposes." Id., 542. The statute does not, however, mandate unqualified or preferential military access; rather, it "specially protects military recruiters by granting them equal access." Id., 544. Consequently, the court rejected the plaintiff's construction, which "would grant the military unenacted and unintended universal access . . . which would give undue preference to military recruitment . . . ." Id., 545. Therefore, the court concluded that because the board's resolution would forbid on-campus recruiting access to a nonmilitary employer who discriminated on the basis of sexual orientation, to effectuate the statute and provide the military with access "on the same basis,"[22] the military must similarly be banned.[23] Id., 546–47.

[21] This resolution provided in relevant part: " 'No organization shall be permitted in any City School District building for the purpose of recruiting City School District students if such organization has a stated policy which discriminates against any person on the basis of race, color, religion, handicap, sex, creed, political beliefs, age, economic status, or sexual orientation, until such time as these discriminatory policies are discontinued.' " *Lloyd v. Grella*, supra, 83 N.Y.2d 543.

[22] We recognize that the operative language in § 2-a is "on the same basis," but we discern no difference between that phrase and the word "same" in § 10a-149a.

[23] The court also concluded that "the legislative history supports access only upon similar terms and conditions as are allowed to other prospective employers. It does not support something denominated broadly and unqualifiedly as 'guaranteed access.' " *Lloyd v. Grella*, supra, 83 N.Y.2d 546.

Any unresolved questions as to the interpretation of § 10a-149a are answered by an examination of the public policy involved in this case. Speaking in favor of the Gay Rights Law, Senator George Jepsen aptly described the need for such protective legislation. "I speak in favor of this bill because it addresses discrimination on the basis of status, not specific acts, because such discrimination is widespread, even systematic in our society, because sexual orientation is not protected, unfortunately, by our Constitution, and as such, it is entirely appropriate to address this difficult and important subject in the Congress and in the Legislatures across our country. I believe that the mark of a civilized society is how well it addresses the needs of those least well-equipped to protect themselves and that . . . throughout our history each generation has had to stand up and be counted on whether they're going to protect those most poorly situated to protect themselves, whether it was with the waves of immigration in the 19th and 20th centuries, whether it was to protect political activists in the wake of World War I or in the McCarthy era, whether it was to protect against religious discrimination . . . throughout our history, whether it was the Civil Rights struggle to protect blacks and Hispanics, culminating in the 1960s, whether it was the struggle for equality for women in the 1960s, 1970s and today and now we have the issue of sexual orientation. . . . [C]ountless gays . . . fear discrimination in their jobs, in their housing . . . . I know of overt acts of discrimination, whether it's slurs, ugly slurs painted on the sides of houses or on the cars of homosexuals, whether it was the testimony of individuals before the Judiciary Committee earlier this year, whether it was the letters and the write-ins from countless individuals who are gay and who have faced discrimination in their lives . . . ." 34 S. Proc., Pt. 3, 1991 Sess., pp. 983–85.

The Gay Rights Law was enacted in order to protect people from pervasive and invidious discrimination on

the basis of sexual orientation.[24] We cannot interpret § 10a-149a to override this necessary protection without a strong showing by the defendants that that is what the legislature intended.[25] Because § 10a-149a implicates strong public policy concerns regarding the protection of a class of people from discriminatory practices, we must strictly construe the entire statute in light of this public policy. See 3A J. Sutherland, supra, § 74.11, p. 401 ("interpretation of statutes which impinge upon civil liberties is generally treated as an extraordinarily serious business, subject to special considerations"). In doing so, we are not persuaded by the defendants' interpretation of the statute and we conclude that the United States military is presently prohibited from recruiting on the law school's campus

---

[24] General Statutes §§ 46a-81a through 46a-81n of the Gay Rights Law provide that it is the public policy of this state that individuals are not to be discriminated against because of their sexual orientation—that is, the law prohibits discrimination against a person based on his or her "preference for heterosexuality, homosexuality or bisexuality, having a history of such preference or being identified with such preference . . . ." General Statutes § 46a-81a. This public policy reaches a wide spectrum of activities, including: membership in licensed professional associations (§ 46a-81b), employment (§ 46a-81c), public accommodations (§ 46a-81d), housing (§ 46a-81e), credit practices (§ 46a-81f), employment in state agencies (§§ 46a-81h and 46a-81j), the granting of state licenses (§ 46a-81k), educational and vocational programs of state agencies (§ 46a-81m), and allocation of state benefits (§ 46a-81n). Furthermore, pertinent to this case, the legislature has prohibited discrimination on the basis of sexual orientation by "[a]ll state agencies, including *educational institutions*, which provide employment referrals or placement services to public or private employers . . . ." (Emphasis added.) General Statutes § 46a-81j (a); see General Statutes § 46a-81i.

[25] At the time § 10a-149a was enacted, the Gay Rights Law did not exist. Nor is there any evidence that the legislature has revisited § 10a-149a since the passage of the Gay Rights Law that would support an application of the "notwithstanding" clause to the Gay Rights Law. Moreover, "the legislature is presumed to exercise its statutory authority with knowledge of existing statutes and with the intention of creating one consistent body of law . . . ." (Internal quotation marks omitted.) *Caron* v. *Inland Wetlands & Watercourses Commission*, 222 Conn. 269, 277, 610 A.2d 584 (1992). Our interpretation of § 10a-149a as giving the military the same on-campus access as civilian employers is consistent with the Gay Rights Law and serves to further rather than impede its goals.

because of its current discrimination against gay men and lesbians.

The judgment is affirmed.

In this opinion BERDON and NORCOTT, Js., concurred.

BERDON, J., concurring. I join the majority in its well reasoned opinion that concludes that the military, because of its current discriminatory practices against gay men and lesbians, cannot use the facilities of the University of Connecticut Law School (law school) for recruitment purposes. I write separately to express my concern regarding the dissenters' fundamental misunderstanding of General Statutes § 10a-149a[1] and their flawed analysis. That misunderstanding and flawed analysis is obviously driven by their failure to recognize and accept the fundamental change in Connecticut's public policy regarding gay men and lesbians. That public policy, adopted through legislation enacted in 1991, comprehensively prohibits discrimination on the basis of sexual orientation. See General Statutes § 46a-81a et seq. (Gay Rights Law).

I am troubled by the dissenters' interpretation of the "[n]otwithstanding any other provision of law to the contrary" clause of § 10a-149a. They assert that § 10a-149a "provides the military with a unique exemption from our antidiscrimination laws for the limited purpose of recruiting." If that be the case, they assign no meaning to the operative clause of § 10a-149a, which

---

[1] General Statutes § 10a-149a provides: "Notwithstanding any other provision of law to the contrary, each constituent unit of the state system of higher education and any private college or university which receives state funds shall, subject to the provisions of subdivision (11) of subsection (b) of section 1-19, provide the same directory information and on-campus recruiting opportunities to representatives of the armed forces of the United States of America and state armed services as are offered to nonmilitary recruiters or commercial concerns."

provides that the law school "shall . . . provide the *same* directory information and on-campus recruiting opportunities to representatives of the armed forces . . . as are offered to nonmilitary recruiters or commercial concerns."[2] (Emphasis added.) Moreover, neither dissenter adequately explains how the "notwithstanding" clause of § 10a-149a permits the military, which currently discriminates on the basis of sexual orientation, to recruit on campus when nonmilitary employers, who similarly discriminate, are barred.

To fully understand our current law, we must appreciate the conduct that was and was not permitted earlier. In 1983, the legislature adopted No. 83-576 of the 1983 Public Acts (P.A. 83-576), which provided that the regional community colleges, the state technical colleges, the Connecticut state universities, and the University of Connecticut were to grant "access to any campus under [their] jurisdiction to any representative of the armed forces of the United States of America who seeks entrance onto such campus for the purpose of conducting job interviews." It is without dispute, based on the legislative history, that P.A. 83-576 was intended to treat the military "like anybody [else]" with respect to on-campus recruitment.[3] Therefore, in 1983, when employ-

---

[2] Contrary to the express language of the statute, the dissenters wish to favor the military, and allow the military to use state facilities for recruitment, while engaging in conduct that would prevent a private employer from using state facilities for recruitment purposes. To accomplish this goal, Justice Callahan, in footnote 7 of his dissent, in which Justice Palmer joins, states that but for the "notwithstanding" clause, he would agree that under § 10a-149a the military "should be treated exactly like any other employer." Because of the "notwithstanding" clause, the dissenters, however, curiously conclude that "same" does not mean same. Rather, they argue that, because of the military's "well documented practices" of discrimination against gay men and lesbians, the military is to be treated *differently* than, not the same as, private employers. This logic eludes me.

[3] Senator Thomas Scott, the provision's sponsor, stated that "military recruiters ought to in turn be treated like anybody from a corporation or anybody else who wishes to come to a campus and talk to students about job opportunities . . . ." 26 S. Proc., Pt. 13, 1983 Sess., p. 4530.

ers were permitted to discriminate on the basis of sexual orientation, P.A. 83-576 mandated that the military, despite its discriminatory practices, be allowed to recruit on state campuses. As the majority opinion notes, the following year the legislature revised its statutory language and adopted § 10a-149a, by enacting No. 84-87 of the 1984 Public Acts, to better reflect the legislative intention expressed in the 1983 and 1984 debates—that is, the military be given the *same* recruitment opportunities as nonmilitary employers.

With the adoption of the Gay Rights Law in 1991, however, employers are prohibited from discriminating on the basis of sexual orientation. General Statutes § 46a-81c. Those employers that continue to discriminate are now prohibited from using state facilities, such as the law school's career services office, for any purpose. General Statutes § 46a-81i (b).[4] Accordingly, the military, as long as it persists in discriminating against gay men and lesbians, will not be allowed to recruit on the law school's campus.

The dissenters find it difficult to understand why, if by the adoption of § 10a-149a in 1984 the legislature intended to change the law regarding military recruitment at the law school, there was not substantial legislative debate regarding such an impact. With a clear understanding of the various statutes and their respective dates of passage, it becomes evident that the dissenters' difficulty is without substance. As I indicated previously, § 10a-149a had no practical effect on the statutes governing the law school when it was adopted in 1984, because at that time employers were free to discriminate on the basis of sexual orientation and therefore the military, with its discriminatory practices,

---

[4] General Statutes § 46a-81i (b) provides: "No state facility may be used in furtherance of any discrimination, nor may any state agency become a party to any agreement, arrangement or plan which has the effect of sanctioning discrimination."

was permitted to use the law school's facilities. Consequently, there would have been no purpose in 1984 for such a vociferous debate. Rather, the debate that the dissenters seek occurred in 1991 when there was a practical change.

It was in 1991 that the legislature changed the public policy of this state as it pertained to gay men and lesbians by adopting the Gay Rights Law. At that time, the legislature was fully cognizant of its actions, for the Gay Rights bill was hotly contested before the legislature. The vitriolic debate that the dissenters seek is indeed present.[5]

---

[5] In both chambers of the General Assembly, there was substantial opposition to the bill. In the House of Representatives, eighty-one members voted in favor of the bill, sixty-five voted against it, and five did not vote, while in the Senate, twenty-one members voted in favor of the bill, fourteen voted against it, and one was absent. 34 H.R. Proc., Pt. 7, 1991 Sess., p. 2782; 34 S. Proc., Pt. 3, 1991 Sess., p. 1004. Reflective of this vote, the debate was divided and heated. Among the comments in support of the bill were the following: "[B]ecause such discrimination is widespread, even systematic in our society, because sexual orientation is not protected, unfortunately, by our Constitution, and as such, it is entirely appropriate to address this difficult and important subject in the Congress and in the Legislatures across our country." 34 S. Proc., Pt. 3, 1991 Sess., p. 983, remarks of Senator George Jepsen; "I don't think there is any justification in our society for people living in fear." Id., p. 996, remarks of Senator Cornelius O'Leary; "The highest responsibility of a government is to care for those people and protect those people who need our protection. We have a bill that fulfills both that [moral] and that civic responsibility." Id., p. 1003, remarks of Senator Charles Allen III; "It's a simple bill that says that people cannot be denied certain equal rights based on their sexual orientation. I think when I say we're at a crossroads, I think we have an opportunity to either perpetuate a negative cycle or take steps forward on a positive cycle." 34 H.R. Proc., Pt. 7, 1991 Sess., p. 2737, remarks of Representative Miles S. Rapoport; "What this bill basically provides is that everybody is entitled to have human decency and respect, everybody is entitled to live in peace, free from harassment, free from violence and with the ability to work and live free of discrimination." Id., p. 2753, remarks of Representative Juan A. Figueroa.

Opposition to the bill was very vocal and diverse. Representative Peter J. Fusscas stated that "this is a negative bill . . . and I was just curious to know whether or not making it a crime was going to engender more mutual respect, understanding and tolerance and I don't really—I really don't think so." Id., p. 2767. Representative Reginald L. Jones stated that "[o]n the other

The legislature was also well aware of the consequences of this legislation. That awareness is demonstrated by the fact that the legislature specifically exempted the Reserve Officers' Training Corps (ROTC) program at the University of Connecticut from the Gay Rights Law. General Statutes § 46a-81q.[6] Religious orga-

hand, there are many of us who believe there is a moral issue that underlies this situation and that represents a watershed public policy decision." Id., p. 2754. Representative Alan Schlesinger felt that "this legislation can be misused and in some states has been misused and that's why I have to vote no." Id., p. 2747. Representative Arthur O'Neill wondered if the bill would result in an increase in homosexuals moving to Connecticut and doubted that there was a need for such legislation, stating: "[S]ome of my constituents have asked me regarding this legislation as to whether or not we would expect to see a large influx of homosexual or lesbian persons moving into Connecticut, looking for jobs, housing, or credit . . . . If Connecticut is practicing pervasive persecution of homosexuals and lesbians, I'm unable to explain why they have not sought out the protections of the laws of Wisconsin or Massachusetts or those localities which afford them the type of protection that this legislation is designed to afford them." Id., pp. 2725–29. Representative John Wayne Fox also doubted the need for this legislation, stating: "If you come before this body and you want to claim that you're entitled to a special privilege, a special protection because you have been discriminated against, the least we can hope for, the least we can ask, as the public policy setting body of this state is that there be evidence of that fact and I submit to you that has not happened." Id., p. 2720. Representative Eugene A. Migliaro, Jr., expressed general homophobic fears, including antigay sentiments, stating: "According to this bill, I cannot deny a homosexual from renting and I have to put my kids in jeopardy of something that I fear could be detrimental to them. Where are my rights? . . . Mr. Speaker, we've been on the floor of this House for many years debating this issue. We've seen it growing like a cancer. . . . Another thing that bothers me, Mr. Speaker, and Members of the House, I have to have a new dictionary now and I'm not saying these things to be indifferent or to cause any hard feelings, but years ago you said I had a gay old time, it was fine. You can't say it anymore. Years ago we said that person looks like a fruitcake. You can't say it anymore. Years ago you said, hey, look at that [fairy]. You can't say it anymore, but they can turn around and commit any indecent act that they want." Id., pp. 2681–85.

[6] Section 46a-81q exempts ROTC programs from the Gay Rights Law: "The provisions of sections 4a-60a and 46a-81a to 46a-81o, inclusive, shall not apply to the conduct and administration of a ROTC program established and maintained pursuant to 10 USC Sections 2101 to 2111, inclusive, as amended from time to time, and the regulations thereunder, at an institution of higher education. For the purposes of this section, 'ROTC' means the Reserve Officers' Training Corps."

nizations were also furnished with an exemption. General Statutes § 46a-81p. The legislature, however, did not provide military recruiters with an exemption.

The dissenters argue that the legislature must have intended something by the adoption of the "notwithstanding" clause of § 10a-149a and it did. Read in context,[7] the "notwithstanding" clause underscores the fact that the legislature wished to ensure that the military would have the *same* recruitment opportunities as those provided to nonmilitary recruiters. In other words, the legislature was simply attempting to level the playing field between nonmilitary employers and the military, not tilt the field in favor of the military.[8]

As the dissenters concede, this court has previously interpreted the phrase "[n]otwithstanding any other provision of law to the contrary" in the context of the Freedom of Information Act, General Statutes § 1-7 et seq. *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 654–55, 631 A.2d 252 (1993). In *Gifford*, the majority of this court, which included Justice Callahan, held this phrase to mean that a matter "within this section that would otherwise be governed . . . by any other provision of the General Statutes, is nonetheless governed, not by the other provisions, *but by this provision*." (Emphasis added). Id., 654. In other words, the "notwithstanding" clause means that no matter

---

[7] See footnote 1.

[8] Justice Callahan, in footnote 5 of his dissent, declares that the "notwithstanding" clause allows "the military to recruit on state campuses despite noncompliance with any [of Connecticut's] antidiscrimination statutes . . . ." According to the dissenters, even if the military choose to discriminate based upon race, religion, sex, marital status, ancestry or national origin, the military would still be able to utilize the services of our state agencies. Actually, the dissenters' interpretation of § 10a-149a would exempt the military from any of our laws that qualify who may use state facilities for recruitment purposes, not just antidiscrimination statutes. Such an unprecedented and unconditional right not only leads to an offensive conclusion, but it also ignores the operative mandate of § 10a-149a.

what any other law may otherwise provide, *the operative clause* of this provision controls.[9] Today, the majority correctly interprets the "notwithstanding" clause, as it is used in § 10a-149a, in an identical manner.

The majority's interpretation of § 10a-149a is wholly supported by *Lloyd* v. *Grella*, 83 N.Y.2d 537, 634 N.E.2d 171, 611 N.Y.S.2d 799 (1994), which was decided recently by the New York Court of Appeals. In *Lloyd*, the New York Court of Appeals interpreted a statute that has the same "notwithstanding" clause and in all other respects is virtually identical to § 10a-149a.[10] The Court of Appeals reversed the lower court[11] and held that "[t]he use of the phrase 'on the same basis' in Education Law § 2-a is synonymous with 'equal access',

---

[9] Justice Palmer, in his separate dissenting opinion, claims that the "notwithstanding" clause is "an unambiguous expression of legislative intent that the rule set forth in § 10a-149a *shall take precedence over any other provision of the law* that would otherwise bar the military from engaging in the same on-campus recruitment activities as civilian employers." (Emphasis in original.) I completely agree. If a nonmilitary employer is not legally barred from recruiting on campus, then neither should the military. Justice Palmer, however, fails to recognize that nonmilitary employers who discriminate on the basis of sexual orientation are barred by the Gay Rights Law from using state facilities for recruitment. Consequently, § 10a-149a bars the military, which presently engages in similar conduct. When interpreting § 10a-149a, Justice Palmer, like Justice Callahan, disregards the word "same."

[10] New York Education Law § 2-a (McKinney 1988) provides in relevant part: "*Notwithstanding any other provision of law to the contrary* . . . [the] trustee, president, principal, officer, board or administrator shall provide access to directory information relating to pupils and access to such school property *on the same basis* for official representatives of the state militia and the armed forces of the United States for the purpose of informing pupils of educational, occupational or career opportunities . . . ." (Emphasis added.)

[11] The New York Supreme Court, which was affirmed by the Appellate Division of the Supreme Court, held that: "The Board of Education must . . . provide the military with the same access to school property as other recruiters are afforded for purposes of informing students of 'educational, occupational or career opportunities' (Educational Law § 2-a), *regardless* of the military's policy concerning homosexuals." (Emphasis in original.) *Lloyd* v. *Grella*, supra, 83 N.Y.2d 544.

not unqualified access." Id., 545. The Court of Appeals reasoned that to endorse such an interpretation "would grant the military unenacted and unintended universal access . . . . That construction, which would give undue preference to military recruitment, finds no support in an equal access statute, designed as 'a narrow and legitimate jurisprudential' shield, not as an unlimited sword of entry." Id. Interestingly, the *Lloyd* court concluded that the military was barred from recruiting in schools in Rochester, New York, under the equal access statute, not because of a general statute that set forth the state's public policy of protecting gay men and lesbians from discrimination, but because of a school board resolution prohibiting any employer who discriminated on the basis of sexual orientation from recruiting in the schools. Id., 545–47.

Although the Court of Appeals in *Lloyd* found the language of the "equal access" statute to be plain and unambiguous, it also added that, as in this case, "the legislative history supports access only upon similar terms and conditions as are allowed to other prospective employers. It does not support something denominated broadly and unqualifiedly as 'guaranteed access.' " Id., 546.

Finally, even if § 10a-149a and the Gay Rights Law are ambiguous, which I do not believe is the case, I would arrive at the same conclusion by way of established principles of statutory construction. The Gay Rights Law is clearly intended to reverse the years of discrimination experienced by gay men and lesbians. Remedial statutes such as the Gay Rights Law must "be liberally construed in favor of those whom the legislature intended to benefit [i.e., gay men and lesbians]"; *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 615 n.4, 440 A.2d 810 (1981); and "in furtherance of this principle, exceptions and exclusions are to be strictly construed." *State Board of Labor Relations* v. *Board*

*of Education,* 177 Conn. 68, 74, 411 A.2d 28 (1979). Accordingly, as long as the military discriminates against gay men and lesbians it will be barred from recruiting at the law school, as well as at any of the other state colleges and universities.

Gay men and lesbians have a right to be free from the discrimination and degrading homophobia that is prevalent in our society. The legislature has adopted this public policy, not only with respect to employment,[12] but also in areas such as the use of state facilities,[13] professional associations,[14] public accommodations[15] and housing.[16] It is also clear that the legislature, by adopting § 10a-149a in 1984, wanted to furnish the military with the same rights to recruitment as nonmilitary employers—no more or no less. Today, in 1996, the public policy of this state is unequivocal: Discrimination based upon sexual orientation is prohibited and those who persist in discriminating against gay men and lesbians will, among other sanctions, be barred from utilizing state facilities unless specifically exempted.

CALLAHAN, J., with whom PALMER, J., joins, dissenting. I dissent from the majority opinion because I cannot believe that the legislature in 1984 intended to make a radical change in legislation pertaining to a controversial subject, legislation enacted only the previous year, and yet not one legislator saw fit even to mention the change during the legislative process. When a legislature "abandons previously articulated policies, one 'would normally expect some expression by [the legislature] that such results are intended.' *United States* v. *United Continental Tuna Corp.,* 425

[12] General Statutes § 46a-81c.
[13] General Statutes § 46a-81i.
[14] General Statutes § 46a-81b.
[15] General Statutes § 46a-81d.
[16] General Statutes § 46a-81e.

U.S. 164, 169, 96 S. Ct. 1319, 1323, 47 L. Ed. 2d 653 (1976)." *New Jersey Transit Policemen's Benevolent Assn. Local 304* v. *New Jersey Transit Corp.*, 806 F.2d 451, 456 (3d Cir. 1986); see *Nor'easter Group, Inc.* v. *Colossale Concrete, Inc.*, 207 Conn. 468, 481, 542 A.2d 692 (1988) (It would be incongruous for the legislature to alter a clearly defined and well established statute "without spelling out that [change] unambiguously, let alone not mentioning it at all. . . . '[A] radical departure from an established policy . . . must be expressed in unequivocal language.' ").

In 1983, the legislature enacted No. 83-576 of the 1983 Public Acts (P.A. 83-576), which prohibited the board of trustees of any state university "from denying access to any campus under its jurisdiction to any representative of the armed forces of the United States of America who seeks entrance onto any such campus for the purpose of conducting job interviews." P.A. 83-576 was adopted in direct response to a situation that had arisen at the University of Connecticut School of Law (law school) wherein the law school faculty had prohibited the military from recruiting on campus because of the military's policy of discriminating against homosexuals. 26 S. Proc., Pt. 13, 1983 Sess., pp. 4529–30, remarks of Senator Thomas Scott (amendment addresses "the situation at [the law school] where the faculty . . . decided for various reasons that military recruiters should be banned from our University"); id., p. 4533, remarks of Senator Steven Casey ("[the law school] has prohibited certain military service recruiters from recruiting on campus due to their discrimination against homosexuals"). The majority concedes that P.A. 83-576 "provided an unconditional right of access to state schools for military recruiters . . . under all circumstances." The majority concludes, however, that No. 84-87 of the 1984 Public Acts (P.A. 84-87), which succeeded P.A. 83-576, was intended by the legislature to terminate

the military's year old statutory right to unimpeded access to state university campuses and to treat the military exactly the same as any other employer. That conclusion is at odds with the legislative history of P.A. 83-576 and P.A. 84-87 and with well settled rules of statutory construction.

In 1984, the legislature repealed P.A. 83-576 and replaced it with P.A. 84-87, which is currently codified at General Statutes § 10a-149a. Section 10a-149a provides: *"Notwithstanding any other provision of law to the contrary,* each constituent unit of the state system of higher education and any private college or university which receives state funds shall, subject to the provisions of subdivision (11) of subsection (b) of section 1-19,[1] provide the same directory information and on-campus recruiting opportunities to representatives of the armed forces of the United States of America and state armed services as are offered to nonmilitary recruiters or commercial concerns." (Emphasis added.) No mention was made in the floor debates concerning the bill that became P.A. 84-87 in either the House of Representatives or the Senate regarding any departure from the purpose of P.A. 83-576. Nor was any indication

---

[1] General Statutes § 1-19 provides in relevant part: "(b) Nothing in sections 1-15, 1-18a, 1-19 to 1-19b, inclusive, and 1-21 to 1-21k, inclusive, shall be construed to require disclosure of . . . (11) names or addresses of students enrolled in any public school or college without the consent of each student whose name or address is to be disclosed who is eighteen years of age or older and a parent or guardian of each student who is younger than eighteen years of age, provided this subdivision shall not be construed as prohibiting the disclosure of the names or addresses of students enrolled in any public school in a regional school district to the board of selectmen or town board of finance, as the case may be, of the town wherein the student resides for the purpose of verifying tuition payments made to such school . . . ."

The majority hypothesizes that "the 'notwithstanding' clause may have been added in 1984 in order to protect against other statutes dealing with directory information . . . ." The text of § 10a-149a plainly refutes this hypothesis in that it specifically provides that the provision of directory information is subject to the limitations of § 1-19—the only statute addressing the provision of directory information by schools.

given that P.A. 84-87 was intended to circumscribe in any way the military's access to on-campus recruiting that had been guaranteed only one year earlier.[2] The legislative history reveals, rather, that the legislative goal in both 1983 and 1984 was to *increase* and guarantee campus access to military recruiters. See Conn. Joint Standing Committee Hearings, Education, Pt. 2, 1984 Sess., pp. 403–407, remarks of Major Louis Wein; 26 S. Proc., Pt. 13, 1983 Sess., pp. 4529–33, remarks of Senators Thomas Scott, Eugene Skowronski, Mary Martin and Michael Morano.

The state education committee's report regarding House Bill No. 5371,[3] which became P.A. 84-87, moreover, indicates that the 1984 bill was not intended, as the majority concludes, to alter existing law by conditioning the military's campus access upon its compliance with Connecticut antidiscrimination laws but, rather, was intended to support the military's recruitment efforts by not only permitting the military access to campuses but also by giving it access to directory information

---

[2] The concurrence seems to advise that the debate that I really should look at occurred in 1991. The 1991 legislative debate regarding discrimination against homosexuals does not change the fact that the 1984 legislature expressed no intent to eliminate the military's unconditional access to campuses for recruitment purposes, access that had been granted only the previous year. If a substantial change in the law had been intended from 1983 to 1984, the relevant debate would have occurred in 1984, not in 1991.

[3] House Bill No. 5371, which eventually became § 10a-149a, was modeled after a 1983 New Hampshire bill provided to the chairpersons of the education committee by House Majority Leader John Groppo. That New Hampshire bill provided: "Duty to Provide Directory Information and Access. Notwithstanding any other provision of law to the contrary, all public high schools and all institutions within the state university system and all private high schools, colleges and universities which receive state funds shall provide the same directory information and on-campus recruiting opportunities to representatives of state or United States armed services as they offer to nonmilitary recruiters or commercial concerns." N.H. House Bill No. 827.

Interestingly, the only alterations made to the New Hampshire bill by our legislature involved access to directory information and the types of educational institutions to which the Connecticut bill would apply.

despite its noncompliance. Further, the bill expanded the list of those institutions that had been subject to P.A. 83-576 to include private institutions and public high schools.[4] There is no support in the legislative history for the majority's conclusion that P.A. 84-87 was intended to make inroads on the access to educational institutions for recruiting provided to the military by P.A. 83-576. In fact, the obvious intent of the legislature was to the contrary. Certainly there was no intention expressed to abandon the purpose for which P.A. 83-576 had been enacted a year earlier—i.e., to provide the military the opportunity to recruit on state campuses despite its discriminatory policies. 26 S. Proc., Pt. 13, 1983 Sess., pp. 4529–33, remarks of Senators Thomas Scott, Eugene Skowronski, Mary Martin and Michael Morano. Until now, we have adhered to the principle of statutory construction that "[a]n amendatory act is presumed not to change the existing law further than is expressly declared or necessarily implied." (Internal quotation marks omitted.) *Nichols* v. *Warren*, 209 Conn. 191, 201, 550 A.2d 309 (1988); *Doe* v. *Institute of Living, Inc.*, 175 Conn. 49, 63, 392 A.2d 491 (1978); see 1A J.

---

[4] In the education committee's written report, under the heading, "Reasons for Bill," the committee stated only: "This bill would require all public high schools, state institutions of higher education and all private high schools and colleges which receive state funds to provide [United States] and state military recruiters with the same directory information and on-campus recruiting opportunities that they offer other recruiters. The law now prohibits the boards of trustees of the state's higher education constituent units from denying [United States] military recruiters access to campuses to conduct job interviews. Current law is silent on the responsibilities of private institutions and public high schools." Education Committee Report No. 205, Concerning House Bill No. 5371, entitled "An Act Providing Military Recruiters Access to Schools and to Directory Information" (March 29, 1984).

Not mentioned as reasons for the bill were the curtailment of military recruitment opportunities until the military complied with antidiscrimination laws or the termination of the military's recently granted "unconditional access" to state campuses for recruitment despite discriminatory hiring policies. Those reasons, noted in the majority opinion, are purely products of the majority's vision of appropriate public policy.

Sutherland, Statutory Construction (5th Ed. Singer 1992) § 22.30. The majority today inexplicably departs from the well settled corollary principle that "[w]e will not infer that the legislature intended to enact a significant change in existing law without an unequivocally expressed manifestation of legislative intent."[5] *State* v. *Cobb*, 234 Conn. 735, 750, 663 A.2d 948 (1995); *New Haven* v. *State Board of Education*, 228 Conn 699, 719, 638 A.2d 589 (1994); *Kinney* v. *State*, 213 Conn. 54, 66, 566 A.2d 670 (1989). Here, not only was there no "unequivocally expressed . . . legislative intent" to curtail military recruiting by the enactment of P.A. 84-87, there is not even a hint of such intent.

The majority nonetheless relies heavily on legislative history in concluding that § 10a-149a mandates that the

---

[5] The concurrence claims that my concern over the majority's conclusion that a substantial policy change occurred in 1984 without being noticed by the legislature is "without substance." The concurrence claims, with its self-proclaimed "clear understanding of the various statutes and their respective dates of passage," that, in 1984, "§ 10a-149a had no practical effect on the statutes governing the law school . . . because at that time employers were free to discriminate on the basis of sexual orientation . . . ." This assertion suffers from both factual inaccuracy and a "fundamental misunderstanding," to borrow a phrase from the concurrence, of my argument. The factual inaccuracy is that § 10a-149a did have a practical effect on the law school because it prohibited the law school from excluding the military based on its discriminatory practices as to homosexuals, among others, as it had done the previous year. See 26 S. Proc., Pt. 13, 1983 Sess., p. 4530, remarks of Senator Thomas Scott (P.A. 83-576 enacted in response to law school's banning of military). The concurrence's "fundamental misunderstanding" is that it focuses on the legality of discrimination on the basis of sexual orientation in 1984 and appears to assert that because it was legal to discriminate based on sexual orientation in 1984, the "notwithstanding" clause was without effect in 1984. I nowhere argue that the terms of P.A. 84-87 directly address discrimination on the basis of sexual orientation. Rather, the "notwithstanding" clause in 1984 allowed the military to recruit on state campuses despite noncompliance with any antidiscrimination statutes that were operative in 1984 and it presently allows the military to recruit on state campuses despite noncompliance with any existing antidiscrimination statutes, including the Gay Rights Law. If the legislature in 1991 had intended something different, it would have been a simple matter to repeal or revise § 10a-149a.

military is to be treated in precisely the same manner as a private employer, which in this instance would mean, that if the military discriminates on the basis of sexual orientation, it would be denied campus access as would a private employer. The only reference in the Senate debate to the bill that became P.A. 84-87, however, came from Senator Steven Casey who remarked that it "would require all public high schools, state institutions of higher education and all private high schools and colleges which receive state funds to provide [United States] and state military recruiters with *the same directory information and on-campus recruiting opportunities that they offer other recruiters.*" (Emphasis added.) 27 S. Proc., Pt. 3, 1984 Sess., p. 1131. The majority reads Senator Casey's remark and similar language in debates on the floor of the House of Representatives as manifesting a clear legislative intent to reverse completely the preexisting legislative policy expressed by P.A. 83-576 to allow military recruitment on campus despite discriminatory hiring policies and to thereafter ban military recruiters from campuses if the military discriminated in its employment policies just as a private employer would be banned if it discriminated in its employment practices.

If the majority is correct that remarks such as Senator Casey's and a similar remark by Representative Dorothy Goodwin in the House of Representatives make it "unequivocally clear" that the legislature intended to strip the military of its recently guaranteed access to campuses for recruiting purposes, it is difficult to explain strikingly similar remarks made only a year earlier when, it is conceded by the majority, the military was permitted campus access for recruiting purposes despite its discriminatory policies. For instance, in support of P.A. 83-576, Senator Scott commented that *"military recruiters ought to in turn be treated like anybody from a corporation or anybody else* who wishes to come

to a campus and talk to students about job opportunities . . . ." (Emphasis added.) 26 S. Proc., Pt. 13, 1983 Sess., p. 4530. Senator Skowronski added that the legislature "ought to send a message to the Law School that *the military ought not to be treated differently than any other group.*" (Emphasis added.) Id., p. 4531.

In isolation, these comments could be read to indicate a legislative intent that the military be subject to the same laws and rules when recruiting on state campuses as a private employer. The fact that these comments were made in support of a bill that plainly prohibited schools from denying campus access to the military, however, indicates that the legislators who expressed themselves meant only that a school could not prevent the military from recruiting because of its discriminatory hiring policies and that the military should be treated the same as private employers despite its hiring policies. A prohibition of military recruiting on campus by the law school and the intent to nullify that prohibition was, after all, the motivating factor in the legislature's passage of P.A. 83-576. 26 S. Proc., Pt. 13, 1983 Sess., pp. 4529–33. Bans on military recruiting similarly motivated the legislature to pass P.A. 84-87; Conn. Joint Standing Committee Hearings, Education, Pt. 2, 1984 Sess., pp. 403–407; and the comments in the legislative history of P.A. 84-87 to the effect that the military ought not be treated differently than private employers must be read in light of P.A. 83-576. *Caron* v. *Inland Wetlands & Watercourses Commission,* 222 Conn. 269, 277, 610 A.2d 584 (1992) (legislature is presumed to act with knowledge of existing law); *Kinney* v. *State,* 213 Conn. 54, 65, 566 A.2d 670 (1989) (same). An almost identical legislative history in successive years should not be distorted to mean one thing one year, i.e., 1983, and something entirely different the next year, i.e., 1984. Faced with this reality, the majority is left to argue only that "the legislative history [of P.A. 83-576] indicates

that . . . unconditional access was not the goal of the statute." This argument is unsupported by a reading of the entire legislative history of P.A. 83-576 pertaining to the access of military recruiters to campuses.[6] More-

[6] The entire Senate debate on P.A. 83-576 pertaining to military access provides as follows:

"The Clerk: Yes, Mr. President. Clerk has Senate Amendment Schedule 'A,' LCO No. 6966, Senator Scott, I believe.

"The Chair: Senator Scott.

"Senator [Thomas] Scott: Thank you very much, Mr. President. Very briefly, the amendment which I am about to offer has not had a public hearing and has not been considered in that capacity. However, the issue which this amendment addresses is something that's relatively recent in the making and that is the situation at UConn Law School where the faculty acting in its capacity as really the overseers of outside activity decided for various reasons that military recruiters should be banned from our University. This is but the first step [i]f this is allowed to continue. If you go to Southern Connecticut State University, Eastern Connecticut State University, Central Connecticut, so on and so forth, I think we've got to stop them dead in their tracks. I think their efforts on behalf of banning military recruiters was frankly shortsighted and uncalled for. Military recruiters, particularly in this day and age of the voluntary military, when our commitment to the military in terms of our people signing up is below what is necessary, should not be discouraged, and I think that we ought to ban them from banning military recruiters and military recruiters ought in turn to be treated like anybody from a corporation or anybody else who wishes to come to a campus and talk to students about job opportunities, and that's really what we're talking about here and I would urge a favorable vote.

"The Chair: You move for adoption of this amendment?

"Senator Scott: Yes, Sir, and I would ask for a roll call as well.

"The Chair: Do you wish to remark further? Senator Casey.

"Senator [Steven] Casey: Thank you very much, Mr. President. I ask my colleagues to oppose this amendment. The reasons I give are that we are overriding the decision of the Board of Trustees without a basic hearing and I think this is something that is very important. I think it deserves a public hearing and I think next session would be the ideal time to do it. We are asking, with this amendment, to override the Board of Trustees and I think that is something that is basically wrong without at least a public hearing. I ask my colleagues to oppose this.

"The Chair: Clerk, please make a . . . do you wish to be heard, Senator Skowronski?

"Senator [Eugene] Skowronski: Thank you, Mr. President. With due respect to the Chairman of the Education Committee, I rise to support the amendment and would like to commend Senator Scott for introducing it. I think we ought to send a message to the Law School that the military ought

over, the majority's argument suggests that those legislators who spoke in favor of the 1983 bill that resulted in P.A. 83-576 either had not read the bill or had not understood its meaning. Such speculation is unwarranted and is unsupported by the record. I am bewil-

not to be treated differently than any other group. Part of our country. They have a legitimate place. Students may wish to get information from them and they have a right to provide that information. I don't feel as though I need a public hearing on this or to have the Board of Governors or anyone else really deal with this. We're the Assembly of the people. I think it's a very clearcut issue. I would urge its adoption.

"The Chair: Senator Morano.

"Senator [Mary] Martin: I concur with the remarks made by Senator Skowronski and I think that we should send a message to the trustees. I think too many people are jumping on bandwagons these days.

"The Chair: Senator Morano. Sorry about that, Senator. I didn't see Senator Martin rise. She's pretty quick on that.

"Senator [Michael] Morano: I was shocked. I thought I was wearing somebody's skirt.

"The Chair: Well, I don't want anything that extreme happening to you.

"Senator Morano: Mr. President, I rise to support the amendment. The University of Connecticut is a land grant college. There are ROTC courses there and I feel that any school that has ROTC has the right to have recruiters on campus. For that reason, I support Senator Scott's amendment.

"The Chair: Senator Schneller.

"Senator [Richard] Schneller: Mr. President, through you a question to Senator Casey. Senator Casey, has the military been banned from any of our institutions of public higher education?

"The Chair: Senator Casey.

"Senator Casey: Through you, Mr. President, I would like to give an unofficial answer to that question by the Majority Leader. As far as I'm aware, the Law School has prohibited certain military service recruiters from recruiting on campus due to their discrimination against homosexuals.

"The Chair: Is there a rejoinder, Senator Morano?

"Senator Morano: Mr. President and Members of the Circle, I think that answer's enough for anybody to vote for this amendment.

"The Chair: Do you wish to respond further? Senator Wilber Smith.

"Senator Smith: Yes, Mr. President. On that last remark, I just want to make it plain that it's because the military is discriminating and that I am opposed to the amendment.

"The Chair: Do you wish to remark further? Clerk, please make an announcement for an immediate roll call." 26 S. Proc., Pt. 13, 1983 Sess., pp. 4529–33.

The entire House debate on P.A. 83-576 pertaining to military access provides as follows:

dered by the majority's argument that P.A. 83-576 granted the military unconditional access to state campuses for recruitment purposes but that the legislative history of P.A. 83-576 does not support such a reading. In order to reconcile the similar legislative histories with their corresponding public acts, we should not, as does the majority, simply dismiss the legislative history of P.A. 83-576 as inconsistent with its plain language. Rather, I would interpret the public acts and their legislative histories to allow the military, despite its practice of discrimination against certain protected classes, to

"Rep. [Robert] Sorenson: (82nd) Thank you Mr. Speaker. Mr Speaker and ladies and gentlemen. Very simply and basically what this amendment does, it would prohibit any of the individual constituent units within the state university system to prohibit a representative of the Armed Forces of the United States of America who seeks entrance onto any such campus for the purpose of conducting job interviews, and I move adoption of the amendment, Mr. Speaker.

"Acting Speaker [Dean] Markham: The question is on adoption. Will you remark further?

"Rep. Sorenson: (82nd) Yes, Mr. Speaker. Mr. Speaker, let me just start by saying that I reluctantly support the amendment. I do not feel that this type of language belongs in our statutes. I do not feel that we should be interfering in the day-to-day workings of the individual constituent units which is what this is. This is legislative intrusion and also, I'd just like to say that presently, there are no institutions which bar recruiters from the armed forces.

"It seems to me a redundant amendment, but then again, the Senate decided in its wisdom to pass it. The bill is an important bill for many of the individual state universities, so rather than risking the chance of losing the bill because of the amendment, I just would reluctantly ask for adoption of the amendment, Mr. Speaker.

"Acting Speaker Markham: The question is on adoption of Senate Amendment Schedule 'A.' Will you remark further?

"Rep. [Vincent] Chase: (120th) Mr. Speaker.

"Acting Speaker Markham: Rep. Vincent Chase.

"Rep. Chase: (120th) Thank you, Mr. Speaker. Very briefly, I support this amendment, and I believe the reason why this came about was that there is one unit that is prohibiting recruitment on the part of the armed services and that is the Hartford Law School of UConn.

"Acting Speaker Markham: Will you remark further on Senate Amendment Schedule 'A'? Will you remark further? If not, members in favor of Senate Amendment Schedule 'A,' please signify by saying aye." 26 H.R. Proc., Pt. 25, 1983 Sess., pp. 8916–17.

nonetheless be provided the same opportunity to recruit on state campuses as a private employer. The majority's interpretation of the language of § 10a-149a requiring schools to provide the military with " 'the same . . . on-campus recruiting opportunities,' " to mean that school authorities must ban the military for noncompliance with antidiscrimination laws, not only ignores the circumstances surrounding the enactment of P.A. 84-87 and " 'its relationship to existing legislation' "; see *Murchison* v. *Civil Service Commission*, 234 Conn. 35, 45, 660 A.2d 850 (1995); but also ignores the prefatory phrase of the entire statute which provides that the provisions of § 10a-149a shall control "[n]otwithstanding any other provision of law to the contrary . . . ."[7]

The majority opinion effectively deprives the prefatory "notwithstanding" clause of the statute of all meaning. If, as the majority asserts, § 10a-149a requires the law school to ban the military from recruiting on the law school campus because of its hiring practices, the "notwithstanding" clause is superfluous. Consequently, the majority's interpretation of § 10a-149a fails to adhere to the well settled principle of statutory construction that "[t]here is a presumption of purpose behind every sentence, clause or phrase in a legislative enactment so that in construing it no part is treated as insignificant and unnecessary."[8] (Internal quotation

[7] If not for the "notwithstanding" clause as well as the previous year's grant of unconditional access for recruitment purposes, I would agree with the majority that the military should be treated exactly like any other employer. In order to provide meaning to the "notwithstanding" clause and to reconcile the legislative actions in 1983 and 1984 with their respective legislative histories, however, I would interpret the language in § 10a-149a granting the military "the same . . . on-campus recruiting opportunities," to mean that the military, given its well documented practices, should nonetheless be allowed to recruit on state campuses. This interpretation is the only one that provides meaning to the legislation and the legislative history in question.

[8] The concurrence makes no attempt to give the "notwithstanding" clause any meaning. The concurrence argues that, by enacting the "notwithstanding" clause, "the legislature was simply attempting to level the playing field

marks omitted.) *Zichichi* v. *Middlesex Memorial Hospital*, 204 Conn. 399, 407, 528 A.2d 805 (1987); *Peck* v. *Jacquemin*, 196 Conn. 53, 66, 491 A.2d 1043 (1985); *Connecticut Light & Power Co.* v. *Costle*, 179 Conn. 415, 422, 426 A.2d 1324 (1980). I do not suggest that the majority has ignored the "notwithstanding" clause. To the contrary, the majority seeks, at some length, to give it meaning. I believe, however, that these attempts are convoluted and unpersuasive and ignore the most obvious interpretation of the "notwithstanding" clause.

The majority cites three reasons why, despite its "notwithstanding" clause, § 10a-149a does not permit the military to recruit on state campuses: (1) there is no indication in the language of § 10a-149a or in its legislative history that it applies to antidiscrimination statutes; (2) "the provisions of law to the contrary" are only those statutes that are contrary on their face rather than contrary in practice; and (3) because there is an exception in the 1991 Gay Rights Law for Reserve Officers' Training Corps (ROTC) programs and no such ROTC exception exists in any of the other antidiscrimination laws, "these statutes could not have been the 'provisions of law to the contrary' referred to in § 10a-149a" in 1984. I will address each of the majority's theories seriatim.[9]

between nonmilitary employers and the military . . . ." Section 10a-149a would accomplish that objective without the "notwithstanding" clause. The concurrence, therefore, treats the "notwithstanding" clause as superfluous. Such a construction defies well settled principles of statutory construction.

[9] Before discussing the majority's interpretation of the "notwithstanding" clause, I find it necessary to challenge the majority's characterization of that clause as a "proviso" or an "exception" to the Gay Rights Law. The majority utilizes that characterization in order to place upon the defendants " 'the burden of proving that they come within the limited class for whose benefit [the law] was established' " and to claim that the "notwithstanding" clause in this case should be "strictly construed with doubts resolved in favor of the general rule . . . ." As the majority asserts, the Reserve Officers' Training Corps provision in the Gay Rights Law is an "exception" in that it is a provision that restricts its general applicability. See 2A J. Sutherland, supra, § 47.11. The "notwithstanding" clause, however, does not represent

The majority first argues that the "notwithstanding" clause does not apply to the antidiscrimination statutes because "[t]here is no indication in the language of [§ 10a-149a] or in its legislative history that the 'notwithstanding' clause refers to these statutes." It is true that there is no specific reference to any particular statute either in the text of § 10a-149a or in its legislative history. As a result, according to the majority, the "notwithstanding" clause does not apply to any statute because there is "no indication" that it applies to any particular statute. This cannot be the case since every phrase in a statute must be given some meaning and without application to other statutes the "notwithstanding" clause has none. See *Zichichi* v. *Middlesex Memorial Hospital*, supra, 204 Conn. 407. Furthermore, in the one case in which we have analyzed a "notwithstanding" clause that is in all relevant parts identical to that in § 10a-149a, we held that such a clause "indicates that a [situation] falling within this section that would otherwise be governed by . . . any other provision of the General Statutes, is nonetheless governed, not by those other provisions, but by this provision." *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 654, 631 A.2d 252 (1993). We further held in *Gifford* that the

a specific exception to the Gay Rights Law but rather a legislative pronouncement within § 10a-149a that any conflict between § 10a-149a and any other law will be resolved in favor of § 10a-149a. The "notwithstanding" clause is more analogous to a general saving statute that "save[s] rights and remedies except where a subsequent repealing act indicates that it was not the legislative intention that particular rights and remedies should be saved." Id., § 47.13. This is a situation where one statute provides for the resolution of conflicts between it and other statutes, not a situation where there is a specific exemption within a statute to that statute's general applicability. Moreover, in the only other case in which this court has interpreted a "notwithstanding" clause in a statute, not only did we not "strictly construe" that clause as the majority does in this case, but we interpreted it broadly. See *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 655 n.15, 631 A.2d 252 (1993). Therefore, I believe that the majority's application of the presumptions and burdens associated with exceptions and provisos is simply wrong.

clause "notwithstanding any other provision of law to the contrary" is indicative of a legislative intent to create a "broad" rule as opposed to a "notwithstanding" clause that explicitly targets a particular statute at which it is aimed. Id., 655 n.15; see, e.g., General Statutes § 1-19 (c) ("[n]otwithstanding the provisions of subdivision [1] of subsection [b] of this section"). When no particular statute is referenced by a "notwithstanding" clause, it applies to all other statutes, rather than no other statutes, an application the majority's first argument would require.

The majority next seeks to give the "notwithstanding" clause some plausible meaning by stating that the " 'any other provision[s] of law to the contrary' to which the statute refers are those that are contrary to the substance of [§ 10a-149a], in specific, those statutes that would deny the military the same directory and recruitment opportunities as are provided to private employers." In other words, the majority concludes that § 10a-149a applies only to any provision of law that would explicitly ban the military from campus when private employers would be permitted access. Because the antidiscrimination statutes only prohibit campus access by the military when they are "appl[ied]," the majority therefore "discern[s]" that the "notwithstanding" clause cannot apply to antidiscrimination statutes. The majority provides no support for this determination and I am at a loss as to its derivation. Neither previous decisions of this court, the text of the statute, nor the legislative history provide any support for the novel argument that the phrase "any other provision of law to the contrary" is somehow limited to those provisions that are facially contrary rather than those that are contrary when applied. Moreover, at the time P.A. 84-87 was enacted, there were no statutes that, on their face and without application, "would deny the military the same directory and recruiting opportunities as are provided to

private employers." Given this fact, the majority's argument appears to be that the addition of the "notwithstanding" clause was an attempt by the legislature to guard against some unknown contrary provision of law. Not only would such a speculative and preemptive measure by the legislature be unprecedented, it would be entirely futile as "[o]ne legislature cannot control the exercise of the powers of a succeeding legislature." (Internal quotation marks omitted.) *Patterson* v. *Dempsey*, 152 Conn. 431, 439, 207 A.2d 739 (1965). If a future legislature for some reason sought to deny the military the same recruiting opportunities as a private employer, it could freely do so by simply repealing § 10a-149a.

The last reason asserted by the majority as to why the "notwithstanding" clause does not apply to the antidiscrimination statutes is the most difficult to understand. The majority appears to argue that because the legislature in 1991 excluded ROTC programs from the Gay Rights Law but has never excluded ROTC programs from other antidiscrimination statutes, the legislature, in 1984 when P.A. 84-87 was enacted, must have considered the military to be in compliance with the statutes prohibiting discrimination. Therefore, according to the majority, the "notwithstanding" clause enacted by the legislature in 1984 could not have applied to and does not apply to any antidiscrimination statutes because the legislature never considered the military to be in violation of those statutes. I do not believe that the majority can "assume" that because the 1991 legislature passed a late amendment to the Gay Rights Law that exempted ROTC programs from its coverage that it can be concluded, as the majority says, that the 1984 legislature considered the military's discriminatory policies to relate only to "bona fide occupational qualifications" that did not violate any antidiscrimination statutes.[10] I can find no support for the proposition that

[10] The only discussion in the legislative record pertaining to the ROTC exception to the Gay Rights Law occurred in the House of Representatives.

any Connecticut legislature ever considered whether
the military's recruiting decisions were limited to bona

That discussion, in relevant part, occurred as follows:

"Rep. [Richard] Tulisano: (29th) Mr. Speaker, the bill deals with ensuring
that the provisions of Section[s] 1 through 17 of the file copy do not apply
to conduct, the administration of ROTC programs established pursuant to
federal law.

"I move [for] its adoption.

"Deputy Speaker [Dean] Markham: Will you comment? Representative
Ward of the 86th.

"Rep. [Robert M.] Ward: (86th) Thank you, Mr. Speaker. Mr. Speaker, I
will support the amendment. I'm a little troubled, though, because when I
raised this very issue in the Judiciary Committee I was told it's really no
concern. It's kind of pre-empted by federal. I didn't think it made a lot of
sense then and I thought that in fact the bill would have resulted in probably
the elimination of every ROTC program in this state, pulling away the kid's
scholarships and closing the programs.

"I'll support this bill so that that won't occur . . . . I can't help but wonder
what other things we're assured, however, are no real problem in the bill
will turn out to be a problem.

"Rep. Tulisano: (29th) Through you, Mr. Speaker. That's a question, I'll
bet. No? Come on.

"Deputy Speaker Markham: Will you remark further on the amendment?
Will you remark further? Representative Wollenberg of the 21st.

"Rep. [William L.] Wollenberg: (21st) Yes, thank you, Mr. Speaker, just
shortly and to follow up on what Representative Ward said at the end of
his discussion was I wonder too what we haven't foreseen in this bill as far
as funds are concerned. Representative Tulisano jumps to the challenge,
but that's one reason when you have a complex bill like this and people
are looking at it and you're trying to discern what things may or may not
be affected by it.

"This one comes up. It strikes you immediately. There may be many,
many others that have not stricken us that will come up and many people
will suffer because of it. I think it needs a longer look than this. I think we
proved the case by this one incident and we better be very, very cautious.
Thank you." 34 H.R. Proc., Pt. 7, 1991 Sess., pp. 2666–67.

Unlike the majority, I am unable to discern from this limited discussion
that the legislature considered the military to be in compliance with all
other antidiscrimination legislation either in 1991 or at any other point in
time. The only insight I glean from this discussion is that, in 1991, the
Judiciary Committee, or at least some members thereof, believed that the
Gay Rights Law would not apply to the military based on the federal preemp-
tion doctrine. See *Chappell* v. *Wallace*, 462 U.S. 296, 302, 103 S. Ct. 2362,
76 L. Ed. 2d 586 (1983) (Congress enjoys plenary constitutional authority
over military). The preemption argument is not raised by the defendants in
this case and the court need not decide it.

fide occupational qualifications or that an interpretation of the "notwithstanding" clause in P.A. 84-87 can be based upon the action of the legislature in 1991 in exempting the ROTC from the Gay Rights Law.

I believe that the only logical interpretation of the "notwithstanding" clause is that espoused by the defendants.[11] This interpretation involves three steps: (1) the phrase "[n]otwithstanding any other provision of law to the contrary" presupposes that there are laws that would prevent the military from recruiting on our state's campuses in the absence of § 10a-149a; (2) the only such laws that exist today or that existed in 1984 that have or had any effect on military hiring policies or practices are those prohibiting discrimination on the basis of age, gender, disability and sexual orientation;[12] and (3) therefore, the only interpretation of § 10a-149a

---

[11] The majority asserts that, according to the defendants, the law school must permit the military to recruit on campus, even though this would result in the school violating the Gay Rights Law. This characterization of the defendants' argument is circular and assumes the answer to the question at issue. Certainly, if the defendants were correct, as long as the "notwithstanding" clause exists, the school would not be violating the Gay Rights Law because military recruitment would not be subject to the Gay Rights Law.

[12] For instance, in 1984, General Statutes § 46a-72 made discrimination on account of gender, disability and age by state agencies that provide employment referrals illegal. If such laws were meant to apply to the military, the military, with its long history of discriminatory practices, would have had to comply with all Connecticut antidiscrimination laws before being able to recruit on state campuses in 1984. Clearly, that was not the intent of the legislature. See Conn. Joint Standing Committee Hearings, Education, Pt. 2, 1984 Sess., p. 411, remarks of Commissioner Stanley Pac ("What they really are looking for here is the same ability to go on and talk to the school kids as other recruiters, and I think it's in the interest of educators, of the military to improve our military. I think it would help give us a strong military, a motivated military and an enlightened one. It would lift up the level of that same military."); id., p. 412, remarks of Lieutenant Robert Frank ("[w]e just want to make the military opportunities available . . . as a viable career alternative and option"); id., p. 417, remarks of Staff Sergeant Mark Gentile ("[i]f we are denied access to campuses and access to directory information, it reduces our recruiters to going to McDonald's to try and talk to young people").

Section 46a-72 is parallel to those portions of the Gay Rights Law at issue

that gives meaning to the "notwithstanding" clause is that it provides the military with a unique exemption from our antidiscrimination laws for the limited purpose of recruiting.

When the legislature enacted P.A. 83-576 to ensure that the military would be permitted to recruit on state university campuses, the military discriminated in its hiring policies. In fact, the one senator who spoke to oppose specifically the substance of the provision allowing the military access to state campuses in 1983 stated that he opposed such access "because the military is discriminating . . . ."[13] 26 S. Proc., Pt. 13, 1983 Sess., p. 4533, remarks of Senator Wilber Smith. In 1983, the legislature acted, in response to a situation at the law school involving the military's hiring policy toward homosexuals, to "ban [our state universities] from banning military recruiters . . . ." Id., p. 4530, remarks of Senator Thomas Scott. The legislature has taken no action since 1983 evincing a legislative intent to abandon its policy of allowing military recruiters on state

here. It provides in relevant part: "Discrimination in job placement by state agencies prohibited. (a) All state agencies, including educational institutions, which provide employment referrals or placement services to public or private employers, shall accept job orders on a nondiscriminatory basis.

"(b) Any job request indicating an intention to exclude any person because of race, color, religious creed, sex, age, national origin, ancestry, mental retardation, learning disability or physical disability, including, but not limited to, blindness shall be rejected, unless it is shown by such public or private employers that such disability prevents performance of the work involved."

General Statutes § 46a-81j provides in relevant part: "Sexual orientation discrimination: Job recruitment and placement services provided by state agencies. (a) All state agencies, including educational institutions, which provide employment referrals or placement services to public or private employers, shall accept job orders on a nondiscriminatory basis.

"(b) Any job request indicating an intention to exclude any person because of sexual orientation shall be rejected."

[13] Senator Casey also spoke in opposition to the amendment requiring military access because of his belief that a public hearing should be held on the matter. 26 S. Proc., Pt. 13, 1983 Sess., p. 4531.

campuses despite the military's discriminatory hiring policies. In the absence of such clear direction from the legislature, it is not our prerogative to declare a contrary public policy no matter what a majority of the court might like it to be. *HUD/Barbour-Waverly* v. *Wilson*, 235 Conn. 650, 659, 668 A.2d 1309 (1995).

I also disagree with the majority's use in its discussion concerning the ROTC exception to the Gay Rights Law of the canon of statutory construction, expressio unius est exclusio alterius, which may be translated as "the expression of one thing is the exclusion of another." Black's Law Dictionary (6th Ed. 1990). I do not dispute that when the legislature excluded the ROTC from the Gay Rights Law at the time of its enactment, the legislature did not also specifically exclude military recruitment. That, however, is not relevant to the determination of whether the preexisting provisions of § 10a-149a will prevail over the "contrary" provisions of the Gay Rights Law because of the "notwithstanding" clause of § 10a-149a. Expressio unius est exclusio alterius, by definition, is applicable only where mention of "one thing" in a statute implies exclusion of another. The exclusion of the ROTC from the Gay Rights Law, however, cannot be said to imply that the "notwithstanding" clause of § 10a-149a has no application to the Gay Rights Law. Military recruitment of students for jobs after graduation has absolutely nothing to do with the existence of a ROTC unit on campus and allowing the establishment of such a unit on campus as an exception to the Gay Rights Law does not logically exclude a statute permitting military recruitment on campus. The fact that the legislature did not duplicate the protections afforded the military by § 10a-149a when it enacted the Gay Rights Law and exempted the ROTC from its operation does not logically lead to the con-

clusion that the legislature intended § 10a-149a to lose its vitality.[14]

Finally, I disagree with the majority's argument that the expressed public policy of eliminating discrimination against homosexuals is absolute and overrides all other concerns. The majority correctly asserts that the motivating purpose of the Gay Rights Law is "to protect people from pervasive and invidious discrimination on the basis of sexual orientation." The majority completely ignores, however, the competing public policy that motivated the legislature to enact P.A. 83-576 and § 10a-149a—that of allowing interested students to acquire information concerning military careers from military personnel on campus to the benefit of the students and the military. See Conn. Joint Standing Committee Hearings, Education, Pt. 2, 1984 Sess., pp. 411–17; see also footnote 9 of this opinion. Furthermore, the majority's public policy argument founders on the ROTC exemption to the Gay Rights Law provided by General Statutes § 46a-81q. It is noteworthy that the ROTC exemption to the Gay Rights Law is emphasized in the majority's discussion of statutory construction, i.e., expressio unius est exclusio alterius, but is conspicuously absent from the majority's public policy argument. That is undoubtedly because it is a far greater incursion on the policy of preventing discrimination against homosexuals to permit the ROTC to establish a military unit on campus than it is to allow the legal arm of the military to conduct interviews at the law school one or two days a year. Yet the former has

---

[14] The majority relies on the decision of the New York Court of Appeals in *Lloyd* v. *Grella*, 83 N.Y.2d 537, 634 N.E.2d 171, 611 N.Y.S.2d 799 (1994), to support its conclusion. That case is inapposite, however, because the meaning of the "notwithstanding" clause in the statute at issue there was never discussed. Moreover, the *Lloyd* court did not face the obstacle that the majority does in the present case because the New York legislature had not granted the military unconditional access to state campuses the year before it enacted the statute at issue.

legislative sanction. Given the statutory ROTC exemption from the Gay Rights Law, it is difficult to see how the majority's public policy argument supports its position. The legislature's enactment of an exemption to the Gay Rights Law for the ROTC, an exemption that permits discrimination against gay men and lesbians that is similar in kind but greater in degree than that permitted by the recruitment provisions of § 10a-149a, undercuts any such argument.

In sum, I find no support for the majority's construction of § 10a-149a. I also cannot believe that the legislature could make a U-turn on a controversial subject from one year to the next apparently without a single legislator expressing an awareness of the change of direction. Further, it strains credulity (let alone the tenets of statutory construction) to believe that the legislature would enact the Gay Rights Law without being cognizant of the existence and import of the "notwithstanding" clause of § 10a-149a. See *Gifford* v. *Freedom of Information Commission*, supra, 227 Conn. 654–55 and n.15 ("notwithstanding" clause in statute means that that statute prevails over other statutes that would otherwise apply).

If the legislature wishes to ban military recruiters from state campuses, that is its prerogative, not ours. I respectfully dissent.

PALMER, J., dissenting. I join the dissent of Justice Callahan because I believe that General Statutes § 10a-149a expressly authorizes the military to conduct on-campus recruiting activities at state-supported schools even though the military engages in discriminatory hiring practices.

In construing § 10a-149a as it does, the majority reaches a result that is not fairly supported by the language of the statute. In particular, the majority misinter-

prets the introductory phrase "[n]otwithstanding any other provision of law to the contrary." The majority incorrectly asserts that that phrase is a statutory "exception" to the "general rule" set forth in § 10a-149a and, accordingly, that it must be "strictly construed with doubts resolved in favor of the general rule rather than the exception." The phrase "[n]otwithstanding any other provision of law to the contrary" is not an exception to the rule enunciated in § 10a-149a at all; it is, rather, an unambiguous expression of legislative intent that the rule set forth in § 10a-149a *shall take precedence over any other provision of the law* that would otherwise bar the military from engaging in the same on-campus recruitment activities as civilian employers.

By erroneously characterizing the "notwithstanding" phrase as a limitation on the rule created by § 10a-149a, the majority embarks on a path that leads it to an implausible construction of that language. Relying solely on this mischaracterization of the phrase as justification for adopting the most narrow possible statutory construction, the majority asserts, without elaboration, that the phrase "any other provision[s] of law to the contrary" refers only to those statutes that would *expressly* deny the military the same directory and recruiting opportunities as are available to nonmilitary employers. As the majority acknowledges, however, there were no such statutes in existence when § 10a-149a was enacted in 1984 and there is not one in existence today;[1] thus, under the majority's interpretation, the legislature would have had *no reason whatsoever* to include the "notwithstanding" provision in § 10a-149a. Moreover, it strains credulity that the legislature would have used such sweeping prefatory language had it sought merely to supersede only those narrow statutory provisions relating directly and specifically to on-campus recruitment by the military.

---

[1] Indeed, the legislature has never enacted such a statute.

This court is not free to attain a result in derogation of the intent of the legislature. Though it might be better public policy to bar the military from on-campus recruiting activities on account of its discriminatory practices, that determination is for the legislature, not for us, to make.[2] Because " 'this court is precluded from substituting its own ideas of what might be a wise provision in place of a clear expression of legislative will' "; *Gonsalves* v. *West Haven*, 232 Conn. 17, 26, 653 A.2d 156 (1995); I respectfully dissent.

[2] Of course, the public policy pronouncements of the legislature must comport with constitutional requirements. No constitutional challenge, however, has been made in this case.