[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON APPLICATION FOR TEMPORARY INJUNCTION
The plaintiff, Wethersfield Country Club Members for Fair Play ("Fair Play"), is an unincorporated association comprised of thirty members of the Wethersfield Country Club, who are also plaintiffs in this action. The plaintiffs seek a temporary injunction[1] against the defendant, Wethersfield Country Club ("WCC" or "the Club"), on the grounds that WCC has violated Public Act 97-85, which provides in pertinent part:
 Section 1. (NEW) (a) For the purposes of this section, "golf country club" means an association of persons consisting of not less than twenty members who pay membership fees or dues and which maintains a golf course of not less than nine holes and (1) receives payment for dues, fees, use of space, facilities, services, meals or beverages, directly or indirectly, from or on behalf of nonmembers or (2) holds a permit to sell alcoholic liquor under chapter 545 of the general statutes.
 (b) No golf country club may deny membership in such club to any person on account of race, religion, color, national origin, ancestry, sex, marital status or sexual orientation.
 (c) All classes of membership in a golf country club shall be available without regard to race, religion, color, national origin, ancestry, sex, marital status or sexual orientation.
(d) A golf country club that allows the use of its facilities or services by two or more adults per membership, including the use of such facilities or services during restricted times, shall make such use equally available to all adults entitled to use such CT Page 10005 facilities or services under that membership. The requirements of this subsection concerning equal access to facilities or services of such club shall not apply to adult children included in the membership. Nothing in this subsection shall be construed to affect the assessment by a golf country club of any fees, dues or charges it deems appropriate, including the ability to charge additional fees, dues or charges for access by both adult members during restricted times.
 Facts
WCC is a private country club consisting of more than 325 members who pay membership fees and dues. It maintains a golf course of eighteen holes and holds a permit to sell alcoholic liquor under chapter 545 of the general statutes. The members who have full golfing privileges, including privileges to play during restricted tee times are known as resident members and senior members. Under the Constitution of WCC the number of resident members is limited to 325 and the number of senior members is limited to 50.
The initiation fee for resident membership has been $6,000 per person since 1989. Since June 1991 resident membership has been available to both men and women on the same terms and conditions. Susan Passman became a resident member in 1993 and is currently the only female resident resident member of WCC.
Patricia Provost and her husband joined WCC in 1977. At that time the initiation fee was $1,500. Since Mrs. Provost was a woman, she could not have applied to be a resident member at the time she joined. However, she was entitled to golfing privileges and the use of the club house facilities by virtue of a family membership. Her family membership golfing privileges did not permit her to play during restricted tee times. The Golf Rules and Regulations of the WCC define restricted tee times as follows: Saturdays before 12:30 p.m., Sundays and holidays before 10:30 a.m. and Mondays and Fridays between 8:00 and 8:30 a.m.
After Public Act 97-85 was enacted, WCC undertook a review of its constitution and bylaws in order to ensure that it complied with that public act. As part of this review, WCC conducted a written survey of its members. That survey showed of the 115 members who had golfing spouses, 34 responded that their spouse would like full golfing privileges. CT Page 10006
During the period of the review the plaintiffs sent a letter to all members of WCC in which they proposed the following three options to resolve "the issue of equal access for existing spouses":
 1. The golfing spouse in the new Resident Member category would be offered the option to obtain full golfing privileges subject to an appropriate fee increase, or to maintain the limited golfing privileges/same fees that have been in place. Again, this would be an option.
 2. Either spouse should have the option to be designated the Resident Member with full privileges while the other would have limited privileges. This has been available for new members since 1991.
 3. A golfing spouse could upgrade to Resident Membership subject to the associated dues and assessments, but not subject to the waiting period, terms of review, or initiation fees of a new member.
As more fully set forth below, WCC has in effect provided its female members with options one and three, albeit at a fee level which the plaintiffs did not envision.
In order to comply with Public Act WCC revised its constitution and bylaws to make it easier for spouses of resident members to become members themselves. It waived all the usual formal application procedures, recommendations, interviews, and credit checks and permitted the spouses who wished to become resident members to bypass the waiting list on which there are currently twenty people. For spouses of resident members who had golfing privileges prior to June 1, 1991, WCC reduced the initiation fee for resident membership from $6,000 to $4,000 and allowed payment of that fee over a period of 12 months. Spouses whose husbands had joined after June 1, 1991 were required to pay the full initiation fee of $6,000 over a period of 18 months.
WCC sent out Transfer Request forms to spouses of resident members in May, 1998 on which the spouses were requested to choose one of two options. The first option was for full resident CT Page 10007 membership as described above. The second was to transfer to associate membership, which permitted the spouse to have the same use of the golf club facilities and golf course that she had had under the family membership at the same price. For those who chose to become full resident members, their new membership status would become effective on June 1, 1998. As of the date of the hearing on this Application for Temporary Injunction no spouse had elected to become a resident member.
Patricia Provost, the only female plaintiff who testified at the hearing, stated that she elected associate membership because she objected to paying the $4,000 initiation fee. Ms. Provost did not object to the payment of full resident dues as a condition of resident membership. Had she elected to become a resident member, her monthly dues would have increased from approximately $71 to $196 per month. Curiously, Ms. Provost also stated that she wanted to have unrestricted access to the golf course, but did not want a right to vote on the operation of the Club.
Susan Passman applied for resident membership in 1993 and went through the same process as a male. She paid a total of $6,000 in initiation fees. Ms. Passman is currently on the Board of WCC. From the point of view of an existing member such as Ms. Passman the maximum number of 325 resident members ensures that the Club's golf course is kept at a manageable level. The 325 maximum is important in that it maintains the structure of the club and safeguards against an overabundance of golfers. Since the golf course at WCC has only one starting tee, an overabundance of golfers eligible to tee off during restricted hours presents a greater problem at WCC than it might at a course which has more than one starting tee.
WCC's purpose in charging initiation fees is twofold. First, such fees contribute to the general operating revenues of the Club. Second, the fees provide stability and continuity by giving the members a financial stake in the Club.
WCC is the only private country club in the Greater Hartford area with a waiting list. The waiting period is one and one half to two years. The Club gains approximately 30 new members per year. There are currently approximately 140 women in the Women's Division of the Club who could convert to resident membership. For each one of those women who becomes a resident member, there would be someone on the waiting list whose membership in WCC would be delayed. If all 140 women were able to convert to full CT Page 10008 resident membership status without paying an initiation fee, WCC would lose over $800,000 in revenue.
The plaintiffs claim that the Club's imposition of the reduced initiation fee is unreasonable and intended to circumvent compliance with Public Act 97-85. WCC views the restricted tee times as a finite resource. It claims that the plaintiffs want the benefit of that resource without incurring the attendant obligation of the payment of an initiation fee. A review of the fees and practices of other clubs supports the position of WCC whose initiation fees and practices are reasonable when compared to those of other golf clubs in the area.
The initiation fee at the Hartford Golf Club is $9,500 per person. The Shuttle Meadow Golf Club charges $7,250 per person. The Tournament Player's Club in Cromwell charges an initiation fee of $12,500. The New Haven Country Club charges an initiation fee of $6,000 per single player and if spouses want full golfing privileges, then there is a combined fee of $10,500.
WCC has not offered female spouses the opportunity to be designated as the resident member with full privileges while their husband retains limited privileges. This option would cause no change whatsoever in the total number of resident members and would not deprive WCC of initiation fees. Administrative inconvenience has been advanced as the only reason for WCC's failure to allow the female of a golfing couple to become the resident member. However, any such administrative inconvenience would be minimal.
 Discussion of the Law and Ruling Standing
WCC argues that Fair Play and its members lack standing to bring this action. The Connecticut Supreme Court addressed the issue of standing of an association in Gay Lesbian Law Studentsv. Bd. of Trustees, 236 Conn. 453, 463-465, 673 A.2d 484 (1996):
"The fundamental aspect of standing . . . [is that] it focuses on the party seeking to get his complaint before [the] court and not on the issues he wishes to have adjudicated. Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 [1968]. Hartford Kosher Caterers, Inc. v. Gazda, 165 Conn. 478, 485, CT Page 10009 338 A.2d 497 (1973). Standing is not a technical rule intended to keep aggrieved parties out of court. . . Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. See, e.g., Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663
(1962); Stern v. Stern, 165 Conn. 190, 192, 332 A.2d 78
(1973). Maloney v. Pac, 183 Conn. 313, 320-21, 439 A.2d 349 (1981). The requirements of justiciability and controversy are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. [Maloney v. Pac, supra, 321]. As long as there is some direct injury for which the plaintiff seeks redress, the injury that is alleged need not be great. Id.; see Bassett v. Desmond, 140 Conn. 426, 432, 101 A.2d 294 (1953). Where the nexus between the injury and the claim sought to be adjudicated is obvious and direct, a plaintiff has standing to maintain the claim. Maloney v. Pac, supra, 322." (Internal quotation marks omitted.) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell, 199 Conn. 609, 612-13, 508 A.2d 743
(1986).
When deciding whether an association has standing to bring a claim, we have adopted the federal standard of associational standing as set forth in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Id.; see Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); California Bankers Assn. v. Shultz, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812
(1974); Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Representational standing depends in substantial measure on the nature CT Page 10010 of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)." (Internal quotation marks omitted.) Connecticut Assn. of Health Care Facilities, Inc. v. Worrell, supra, 199 Conn. 616; accord Windham Taxpayers Assn. v. Board of Selectmen, 234 Conn. 513, 527, 662 A.2d 1281 (1995).
The individual plaintiffs clearly have standing under Gay Lesbian Law Students v. Bd. of Trustees. As members of WCC they have an interest in ensuring that that club does not violate Public Act 97-85. In addition, the female plaintiffs are potentially injured because they are not able to play golf during the restricted tee times without paying increased fees. Their husbands have suffered a potential injury in that the family unit of which they are a part will be impacted financially by the increased fees which WCC is seeking.
 Public Act 97-85.
The plaintiffs' arguments are based primarily on the first sentence of § 1(d) of the Act: "A golf country club that allows the use of its facilities or services by two or more adults per membership, including the use of such facilities or services during restricted times, shall make such use equally available to all adults entitled to use such facilities or services under that membership." The plaintiffs have virtually ignored the third sentence of § 1(d): "Nothing in this subsection shall be construed to affect the assessment by a golf country club of any fees, dues or charges it deems appropriate, including the ability to charge additional fees, dues or charges for access by both adult members during restricted times."
Contrary to the claims of the plaintiffs, the imposition of the initiation fee does not circumvent the Act. Such fees are clearly contemplated by the express language of the Act. WCC apparently chose to do away with the term "family membership package" so that it would not run afoul of the Act's requirement of equal golfing access within all membership classes. In addition to the plain language of the Act, the legislative history makes it clear that golf clubs may continue to offer CT Page 10011 family packages where one spouse plays on a restricted basis, so long as the option of an unrestricted membership is offered to the restricted spouse at whatever price the club deems appropriate. During the floor debate in the House of Representatives on May 7, 1997, Representative Kerensky of the 14th district specifically inquired whether spouses of members could continue to be offered privileges on a restricted basis. The proponent of the bill, Representative Scalettar of the 114th district, responded that such family packages where one spouse plays on a restricted basis and one spouse plays on an unrestricted basis could still be offered at golf clubs, so long as the restricted spouse had the option of purchasing an unrestricted membership.
Rep. Kerensky (14th): .
. . However, there are those clubs who have recognized inequality and have taken the initiative to remove those barriers. And so in that regard, I have a question, through you, Madam Speaker, as the proponent of the amendment
Deputy Speaker Hartley:
Please frame your question, Madam.
Rep. Kerensky (14th):
 If a club has already tackled this issue and arrived through its own governing body at rules that allow the family itself to decide which member would be the most appropriate to play in a highly restricted time zone, would that practice be made illegal by our passage of this bill?
Deputy Speaker Hartley:
Representative Scalettar:
Rep. Scalettar (114th):
Thank you, Madam Speaker. That practice would not be illegal. However, the club would have to offer the option to have access available to both members of the couple and the club could charge an additional CT Page 10012 fee for that or arrange it however it wanted to as long as the option were available.
Through you, Madam Speaker.
Deputy Speaker Hartley:
Thank you Representative Kerensky.
Rep. Kerensky (14th):
 Thank you, Representative Scalettar and Madam Speaker. May I just explore further that — just for clarification for my own purposes that the club would have the right to allow the family to select one member of their own choosing to participate if there were a shortage of time or space?
Deputy Speaker Hartley:
Representative Scalettar.
Rep. Scalettar (114th):
 Thank you, Madam speaker. I can only answer the question the same way I did before. Yes, a club could do that and there might be families where that was perfectly acceptable. However, the club would also have to make available to that family the option of having both adults play at all times and as I noted before, the club could, of course, charge a different amount for that or arrange it in anyway the club deemed appropriate and I might add that Representative Kerensky and I discussed where there is the type of arrangement the Representative has described, but the option is available for the members of the couple to pay an additional sum so that both of them can have access in restricted times.
(Conn. House of Representatives Floor Debate, May 7, 1997.)
The plaintiffs have alternatively ignored the language inP.A. 97-85 permitting clubs to impose "fees, dues or charges," and argued that the fees and dues imposed by WCC "have the CT Page 10013 purpose and effect of excluding women from prime tee times because they are unreasonably high." Plaintiffs' Supplemental Brief in Support of Temporary Injunction at 23. If the proposed initiation fees in question were substantially higher than those of comparable golf clubs, then WCC might be violating the Act. However, the proposed initiation fees for women who wish to play during restricted tee times are at or below the level charged by other golf clubs for similar memberships. Therefore, it is not possible to conclude that WCC is attempting to circumvent the Act by charging unreasonably high fees to women for the privilege of playing during restricted tee times.
The plaintiffs argue that one method of making the golf course "equally available" to women is to allow spouses to designate which member of a couple, husband or wife, would have access to prime tee times. The undersigned agrees. This would have absolutely no impact on the operation of WCC other than putting women on the golf course during prime tee times. The Club has advanced no valid justification for its failure to offer this option to its existing golfing spouses.
Before June, 1991 WCC prohibited women from becoming full members. Therefore when a couple such as the plaintiffs Patricia and Richard Provost joined WCC, Patricia did not have the option of becoming a full member with unrestricted golfing privileges. When WCC rewrote its constitution it assumed that the male member of all couples was the full member of the club with unrestricted golfing privileges. Such an assumption may have been valid with respect to couples who joined WCC after June, 1991 because they had the option of designating the wife as the full member. That assumption was not valid with respect to couples who became members prior to June, 1991. The Act permits a club to assess additional fees, dues or charges for access by both adult members, but does not permit the automatic assumption that the female member is the one who must pay those additional fees, dues or charges.
Based on the foregoing, the WCC has not violated Public Act 97-85, except insofar as it has not allowed those couples who became members prior to June, 1991 to designate the wife as the full golfing member. It is hereby ordered that WCC provide such members with a one time option to designate the wife as the resident member, with such option to be exercised on or before December 31, 1998.
By the court, CT Page 10014 Aurigemma, J.